CHARLES E. AND RUTH D. CURRY (NOW RUTH D. MORGAN), ET AL.,[1] PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 2655-62—2657-62, 2741-62.   Filed February 18, 1965.

*Joseph A. Hoskins* and *Charles P. Schleicher*, for the petitioners.
*Donald L. Sturm*, for the respondent.

FORRESTER, *Judge:* The respondent has determined deficiencies as follows:

| Docket No. | Petitioner | Year | Deficiency |
|---|---|---|---|
| 2655-62 | Charles E. and Ruth D. Curry (now Ruth D. Morgan) | 1954 | $4,933.24 |
|  |  | 1955 | 14,615.10 |
|  |  | 1957 | 1,093.08 |
|  |  | 1958 | 3,288.03 |
|  |  |  | 23,929.45 |
| 2656-62 | Twenty West Ninth Corp | 1957 | 53,420.61 |
|  |  | 1958 | 54,253.81 |
|  |  |  | 107,674.42 |
| 2657-62 | Charles F. and Janet B. Curry | 1954 | 30,548.70 |
|  |  | 1955 | 32,255.00 |
|  |  | 1957 | 59,172.49 |
|  |  | 1958 | 517.22 |
|  |  |  | 122,493.41 |
| 2741-62 | Donald R. and Carolyn C. Elbel | 1957 | 62,560.83 |
|  |  | 1958 | 5,592.76 |
|  |  |  | 68,153.59 |

Many of the issues raised by the pleadings have been settled.   The only issues remaining for decision are (1) whether certain notes issued by the corporate petitioner to some of the individual petitioners represented bona fide indebtedness, and (2) whether the transfer of certain real property to the corporate petitioner is controlled by section 351 [2] and related sections.

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

Petitioners Charles F. and Janet B. Curry (hereinafter referred to as Charles F. and Janet, respectively) are husband and wife residing in Kansas City, Mo.   They filed their joint Federal income tax

---

[1] Proceedings of the following petitioners are consolidated herewith: Twenty West Ninth Corp., docket No. 2656-62; Charles F. and Janet B. Curry, docket No. 2657-62; and Donald R. and Carolyn C. Elbel, docket No. 2741-62.

[2] Unless otherwise stated, all statutory references are to the 1954 Code as applicable during 1956-58.

returns for the taxable years 1954, 1955, 1957, and 1958 with the district director of internal revenue at Kansas City, Mo.

During the taxable years 1954–58, petitioners Charles E. and Ruth D. Curry were husband and wife residing in Kansas City, Mo. They filed their joint Federal income tax returns with the district director of internal revenue at Kansas City, Mo. Subsequent to the end of 1958, petitioners were divorced; petitioner Ruth D. Curry remarried and is now known as Ruth D. Morgan. Charles E. Curry (hereinafter referred to as Charles E.) is the son of Charles F. and Janet.

Petitioners Donald R. and Carolyn C. Elbel (hereinafter referred to as Elbel and Carolyn, respectively) are husband and wife residing in Prairie Village, Kans. They filed their joint Federal income tax returns for 1957 and 1958 with the district director of internal revenue at Wichita, Kans. Carolyn is the daughter of Charles F. and Janet. (Charles F., Janet, Charles E., and Carolyn are sometimes hereinafter referred to collectively as the Curry family.)

Petitioner Twenty West Ninth Corp. (hereinafter referred to as the corporation) is a Missouri corporation having its principal place of business at Kansas City, Mo. It filed its Federal income tax returns for the calendar years 1957 and 1958 with the district director of internal revenue at Kansas City, Mo.

Charles F. was born in Kansas City, Mo., in 1889. His father, who died in 1912, had been in the real estate business in Kansas City. In 1920, Charles F. entered the real estate business with Fred Sharon, a leading realtor in Kansas City and then president of the Kansas City, Mo., Chamber of Commerce. In 1924, Charles F. left Sharon's firm to establish his own real estate office. This office was operated in unincorporated form until about 1932, when it was incorporated as the Charles F. Curry Real Estate Co. This corporation is engaged in the real estate business as agent in buying and selling real estate and as manager of 20 to 25 buildings owned by others. In addition to his activities as officer and director of the Charles F. Curry Real Estate Co., Charles F. has held various offices in local and national real estate organizations. He has been a member of the American Institute of Real Estate Appraisers (M.A.I.) since 1930.

The New York Life Building, now known as the Twenty West Ninth Street Building, is a 10-story office building with basement and subbasement containing some 125,000 square feet of rentable space; it is situated at Ninth Street and Baltimore Avenue in Kansas City, Mo. The building was erected by the New York Life Insurance Co. in 1888. The property was sold in 1924; but in 1931, a purchase money mortgage was foreclosed and the insurance company regained title. More than $200,000 was spent to recondition the building in 1933; at that time, four new (though nonautomatic) elevators were installed.

In the early 1940's, insurance companies held large portfolios of real estate investments acquired as a result of foreclosures on mortgage loans. Because the insurance commissioners of various States were insisting that insurance companies liquidate their real estate holdings and invest in acceptable securities, and because of the difficulty in finding good tenants during the war, insurance companies were offering their properties for sale at depressed prices and on easy terms.

In 1944, the New York Life Building was put on the market through the Heath Moore Co., the local mortgage correspondent of the New York Life Insurance Co., for $250,000. Charles F. Curry Real Estate Co. was given a listing on this property through Heath Moore Co. After showing the New York Life Building to prospective purchasers, Charles F. decided that the property would be a good investment for his family. Accordingly, and after a number of family discussions, it was decided that an offer would be made for the property through the Granthurst Realty Co., a family corporation.

The Curry offer was accepted by the insurance company. The resulting contract called for a purchase price of $240,000, consisting of a $75,000 cash downpayment and a first deed of trust securing the balance of $165,000. The deed of trust called for monthly payments over a 10-year term, with interest 4 percent at first, then $3\frac{1}{2}$ percent. Charles F. and Janet supplied $15,000 of the $75,000 downpayment. Charles E. supplied $5,000 and Carolyn supplied $5,000, each from his or her own funds. The remaining $50,000 was obtained by a bank loan negotiated by Charles F. Curry Real Estate Co. and secured by a second deed of trust. This loan was to be repaid in installments of $1,000 per month plus interest at the rate of 4 percent on the unpaid balance.

Title to the New York Life Building was acquired by Granthurst Realty Co. on November 10, 1944. In addition to the main building, four smaller contiguous buildings were included in the sale.[3] The improvements at 809 Baltimore Avenue and 812 Delaware Avenue were one-story buildings; those at 808 Delaware and 814–818 Delaware had two stories.

On November 20, 1944, Granthurst Realty Co. conveyed the properties acquired from the New York Life Insurance Co. to the members of the Curry family in the following proportions: An undivided 60-percent interest to Charles F. and Janet,[4] an undivided 20-percent

---

[3] Even though these four buildings produced some income, they were low-quality improvements probably worth less than the land under them. Any income and expense data for the Twenty West Ninth Street Building presented herein include the figures for these properties.

[4] In 1952, Charles F. and Janet severed their joint tenancy by conveying their interest to a third party and taking a reconveyance as tenants in common. Thereafter, each owned an undivided 30-percent interest.

interest to Charles E., and an undivided 20-percent to Carolyn. At this time, both Charles E. and Carolyn were over the age of 21. These individuals took the property subject to the outstanding first and second deeds of trust, both of which had been recorded. By 1954, both encumbrances had been paid off.

The original purchase price of $240,000 was allocated by the purchasers, $20,000 to the real estate and $220,000 to improvements. The $220,000 was further allocated among the improvements, as follows:

| | |
|---|---:|
| Elevators | $60,000 |
| Transformer plant | 20,000 |
| Plumbing and heating | 10,000 |
| Buildings: | |
| 20 West 9th St | 110,000 |
| 809 Baltimore Ave | 4,000 |
| 808 Delaware Ave | 3,000 |
| 812 Delaware Ave | 3,000 |
| 814–16 or 18 Delaware Ave.[5] | 10,000 |
| | 220,000 |

All of the buildings were depreciated on a composite straight-line basis on a 25-year useful life from November 20, 1944. The following capital improvements were made by the owners to the Twenty West Ninth Street Building from November 20, 1944, to December 28, 1956:

| | | | |
|---|---|---|---:|
| July | 1, 1948 | Air-conditioning equipment | $2,493.83 |
| July | 20, 1953 | Air-conditioning equipment | 5,254.00 |
| May | 7, 1955 | Air-conditioning equipment (room 800) | 1,152.60 |
| June | 6, 1955 | Air-conditioning equipment (6th floor) | 2,273.50 |
| Aug. | 1, 1956 | Used equipment (3d floor) | 1,265.00 |
| Aug. | 1, 1956 | Building improvements (3d floor) | 13,398.75 |
| Aug. | 1, 1956 | Air-conditioning equipment | 5,442.63 |
| Dec. | 1, 1956 | Building improvements (rooms 621–625) | 1,963.87 |
| | | Total | 33,244.18 |

The Twenty West Ninth Street Building[6] (hereinafter sometimes referred to as the building) occupies the northeast corner of Ninth Street and Baltimore Avenue in Kansas City. The center of the financial district is located at 10th Street and Baltimore Avenue, one block south of the Twenty West Ninth Street Building. Baltimore Avenue turns at Ninth Street; consequently, a person looking north from 10th and Baltimore would see Baltimore Avenue apparently come to an end at the entrance of the Twenty West Ninth Street Building.

The individual owners employed the Charles F. Curry Real Estate Co. to manage the Twenty West Ninth Street Building for them under a standard management contract arrangement. A fee of 5 percent of

[5] Both addresses are stipulated.
[6] The deed of trust given to the New York Life Insurance Co. provided that the name of the building would be changed to eliminate any reference to the insurance company.

all rent collections was paid for this service. The individual owners were kept informed about the operations of the property.

In 1945, Trans World Airlines (TWA) leased 40,000 square feet of space in the building. During its period of occupancy from 1945 until August 1956, TWA made improvements to its leased space, which improvements had a value of between $100,000 and $125,000 when TWA vacated the premises. At the time it terminated its tenancy, TWA was occupying some 66,000 square feet of space, or slightly over one-half the rentable space of the building.

In October 1953, Charles F. received a letter of inquiry from E. M. Simon Co., a New York City real estate broker, concerning the availability of office buildings for purchase in Kansas City, Mo. At the direction of Charles F., a response was sent enclosing a résumé of the Twenty West Ninth Street Building and indicating that the price was $1,500,000. Although further information was requested and sent, there were no further negotiations and no offer was made.

In the late fall of 1953, Charles F. was approached by Kenneth Van Sickle (hereinafter referred to as Van Sickle) concerning the possible purchase of the Twenty West Ninth Street Building by interests represented by Joseph T. Zoline, a Chicago attorney (hereinafter referred to as Zoline). Van Sickle was president of the Chicago, Aurora & Elgin Railway Co.; Zoline was general counsel for the railroad. The Curry interests were represented in the ensuing negotiations by Frank Kanan, sales manager for Charles F. Curry Real Estate Co. from 1953 to 1955; Van Sickle, who lived in Kansas City, acted as Zoline's representative.

On November 12, 1953, Zoline wrote Van Sickle a letter, the body of which was as follows:

Early this week I received from Charles F. Curry Real Estate Company a profit and loss statement of the New York Life Building, Kansas City, and I have gone over this with my clients.

You have stated that the owner has or can obtain a commitment for a first mortgage upon the property of $800,000.

Subject to the verification of the figure submitted and the mortgage commitment, my clients have discussed the possibility of offering Mr. Curry $1,500,000 for the building, payable $100,000 in cash, $800,000 on January 15, 1954 (out of the proceeds of the first mortgage to be obtained) and the balance of $600,000 in installments of $50,000 per annum for a period of 12 years, commencing January 15, 1956. The $600,000 will be secured by a second mortgage on the property and will carry a normal rate of interest.

As I mentioned to you, we have closed several deals of a similar character recently. One of the main inducements therefor is the tax advantage which accrues to the seller. This is realized by virtue of a high price for the property, of which less than 30% is received during the first year. The seller then has only capital gains to report and even this is reportable only on an installment basis. In order to take advantage of the installment reporting basis, it would be necessary to close the deal and pay the $100,000 before the end of this year inasmuch as the $800,000 payment which would follow shortly after would bring

the total over the allowable 30%. In other words, the $800,000 should come in the second taxable year. This means that we may have to move very quickly to take advantage of the installment basis.

We have also discussed the possibility of utilizing a tax loss situation to cut down the capital gain but we can discuss this at a later time if Mr. Curry is interested in a proposition along these lines.

Of the $100,000 downpayment, $50,000 was to be used by the purchasers to pay Frank Kanan his commission on the sale. Van Sickle would be entitled to $25,000 of this as a "finder's fee."

The contents of the above-quoted letter were communicated to Charles F., who directed Frank Kanan to write the following letter, dated November 17, 1953, to Van Sickle:

In answer to Mr. Joseph T. Zoline's letter of the 12th, Mr. Curry has indicated he would sell on the following basis:

Your buyers to pay $1,500,000 for the building, payable $400,000 in cash on or before December 31, 1953; $800,000 on January 15, 1954 (out of the proceeds of the first mortgage to be obtained); and the balance of $300,000 over a period of 12 years, commencing January 15, 1956—the $300,000 to be secured by a second mortgage on the property, with interest at 4½% per annum.

Negotiations among the parties continued at varying levels of intensity over the next 6 or 7 months; they were carried on by letter, telephone, and personal meetings. On December 17, 1953, a proposed contract embodying the terms of the proposal contained in the letter of November 17 was sent to Zoline by Frank Kanan. Zoline, however, never signed this contract, but tried to persuade the owners to accept his original proposal. At one stage of the negotiations, Zoline orally proposed a sale on the following terms: The purchase price was to be $1,500,000, payable $50,000 cash down, $800,000 first mortgage, and $650,000 second mortgage providing for release and reexecution if the first mortgage was refinanced, as was contemplated. Both mortgages were to carry interest rates of 4 percent or 4½ percent. The second mortgage would not be in default as to principal or interest so long as all of the income from the propery was used to make payments on the first and second mortgages or to finance capital improvements to the property. Charles F. Curry Real Estate Co. was to have a 5-year management contract. Kanan was still to receive a $50,000 commission from the sellers.

The Currys turned down the offers made by Zoline. Charles E. objected to the postponement of payments of principal and interest on the second mortgage in case of insufficient income, and the lack of permanent liability on the second mortgage on the part of any substantial corporation. Charles F. felt that the lack of any assurance on the part of the Zoline interests that additional money would be invested in the building endangered the future of the building and especially the chances of getting TWA to renew its lease.

Despite intensive efforts of the owners of Twenty West Ninth Street Building to negotiate a renewal of the lease with TWA, it was known by late 1955 that that company would not continue as a tenant. TWA in fact vacated the premises in August 1956. After TWA moved out, Waddell & Reed, the principal underwriters for United Funds investment portfolio, occupied more space than any other single tenant.

In 1956, the Twenty West Ninth Street Building was on the fringe of the central business district of Kansas City. Ninth Street separated the area zoned C–4 (central business district) from the C–1 (light manufacturing) zone in which the building was located. The properties to the west and northwest of the building were only in fair condition, as were the properties on the southeast and southwest corners of Ninth and Baltimore.

Under a plan of redevelopment approved by the city in 1954, approximately 80 percent of the five-square-block area to the north and east of the building constituted the Downtown Redevelopment Area. In December 1956 the buildings in this area had been razed. Although much of the area was being used as automobile parking space, construction had just begun on a 13-story garage and office building to be leased by the Long Lines Division of American Telephone & Telegraph Co. (A.T. & T.). The new building, known as the 811 Main Street Building, was directly across Delaware Street and Main Street from the Twenty West Ninth Street properties.

In the early 1950's, the area between Fifth Street and Independence Avenue and Sixth Street, consisting chiefly of slum properties, was cleared to make way for the Intercity Expressway (Sixth Street Expressway). The expressway, which was dedicated in 1957, was part of a larger program qualifying for Federal assistance under the Federal-Aid Highway Act of 1950.[7] Included in the project were two new bridges over the Missouri River, which permitted easy access to the downtown area from the populous northern districts.

The adoption and implementation of the highway and redevelopment programs resulted in a favorable change in the business climate of downtown Kansas City. In the early 1950's, a number of tenants of downtown office buildings, particularly large insurance companies, had vacated their downtown space and moved into their own buildings south of the central business district. The highway and redevelopment projects resulted in an atmosphere conducive to important new downtown construction. In addition to the building constructed for A.T. & T., a 30-story building at Ninth Street was subsequently planned as a private project of the Commerce Trust Co. On the whole, these various developments halted the exodus of people from the downtown area and had a favorable effect on real estate values in the central

---

[7] Ch. 912, 64 Stat. 785.

business district. The desirability of the office space in the Twenty West Ninth Street Building and the value of the land under the other Twenty West Ninth Street properties were enhanced by the nearby redevelopment area.

The market for office space in downtown Kansas City in 1956 was quite different from what it had been 6 to 10 years earlier. In the years immediately following the end of World War II, this market could best be described as a seller's market. There were usually waiting lists for office space in downtown buildings; consequently, lessors had great control over the rental terms. It was not uncommon for space to be rented "as is." This meant that the tenant had to make his own arrangements for air conditioning, new lighting, new partitions, and the like.

By the early 1950's, however, a number of major tenants had left the downtown district. Although the expansion of business activity prevented any significant increase in vacancies, tenants came to have more influence in setting the terms of leases. It became more difficult to raise rents to compensate fully for increased operating expenses. At the same time, owners found themselves forced to incur expenditures for improvements to rented space, expenditures of the kind formerly borne by the tenants. This trend affected the Twenty West Ninth Street Building. In the new leases of the space vacated by TWA, the owners assumed much of the responsibility for improvements formerly provided by TWA.

Despite the fact that in 1956 the Twenty West Ninth Street Building was 68 years old, it was in very good physical condition and could be expected to stand for many decades. It had been exceptionally well constructed, and was easily adaptable to the needs of tenants looking for large administrative offices as well as for smaller offices.

During 1956, A.T. & T. leased a large portion of the space vacated by TWA. It was understood that the A.T. & T. occupancy was to be on a short-term basis, and until A.T. & T. could move into the new building which was under construction for it. The rental paid by A.T. & T. was higher than that paid by TWA, but was no higher than the average rental rate for space in comparable buildings in Kansas City. The lease required the owners to install central air conditioning for the floors to be occupied by A.T. & T. The owners committed themselves to spend about $75,000 to prepare various parts of the building for occupancy by A.T. & T.

Elbel married Carolyn in 1941. He is a graduate of Harvard College and Harvard Business School. After his discharge from the Army in 1946 he went to work for the Charles F. Curry Real Estate Co., his duties centering in the areas of sales of properties and management of commercial properties. Shortly thereafter he became involved in the housing and commercial construction business through

the Elbel Construction Co., of which he was president and a 50-percent shareholder. After Charles F. and Janet bought the stock of the Heath Moore Co. in 1954 and changed its name to Charles F. Curry & Co., Elbel became executive vice president and later president of that concern. Charles F. Curry & Co. conducts a mortgage loan business in which it procures real estate loans for borrowers and services loans for investors, most of which are eastern banks and insurance companies. During Elbel's 3-year tenure directing operations for Charles F. Curry & Co., its mortgage portfolio rose from $14 million to $175 million. As a result of his work for the several companies with which he was associated, Elbel acquired a great deal of knowledge about commercial real estate values and financing in the Kansas City area.

During the negotiations for the sale of the Twenty West Ninth Street Building to the Zoline interests, Elbel made known to the owners that he was interested in purchasing the building on the same terms as were being offered by Zoline. His proposition was not accepted at that time. In late 1955 or early 1956, Elbel approached Charles E. and suggested that it might be advantageous for the two of them to purchase the building jointly.

Charles E. had worked for the Charles F. Curry Real Estate Co. during 1935 and 1936, and again from 1940 to 1942. Following his discharge from the Navy in November 1945, Charles E. actively engaged in the real estate business in Kansas City, Mo. From January 1946 until July 1947 he was involved in residential construction. In the middle of 1947 he became a full-time officer of Home Savings Association; this was his principal activity until after 1956. The Home Savings Association, an organization in which Charles F. had a financial interest, is the third largest savings association in the State of Missouri. It has a mortgage portfolio of about $70 million. Charles E. was president of Home Savings Association in 1956. Since 1955 he has held the designation M.A.I. (Member of the Appraisal Institute of the National Real Estate Board, an organization which designates qualified appraisers). He has also held various high offices with both Charles F. Curry & Co. and Charles F. Curry Real Estate Co.

When Elbel first suggested a joint purchase of the Twenty West Ninth Street Building, Charles E. was not particularly interested. As time went on, however, he began to agree with Elbel that the growth of the area in which the building was located made the outlook for the building appear quite good. He was particularly impressed by the speed with which the space vacated by TWA was rerented at higher rates. Furthermore, he believed it was desirable from the owners' standpoint to convert their real estate holding into cash and mortgage investment.

Both Elbel and Charles E. were familiar with the physical and financial condition of the Twenty West Ninth Street Building in 1956, as well as with the character of the area surrounding it. Elbel had seen the financial reports received by his wife, Carolyn, as one of the owners. He had studied them prior to forming his initial desire to buy the property. Charles E. had had an office in the building in 1946 and 1947. As an owner, he had participated in negotiations and decisions concerning major leases, and had received monthly statements from Charles F. Curry Real Estate Co. He also personally checked certain records in which he was interested.

Sometime during the last half of 1956, Elbel and Charles E. met with Charles F., Janet, and Carolyn to negotiate a purchase of the property. The negotiations extended over a 3- or 4-month period. All parties were optimistic over the long-range prospects of the Twenty West Ninth Street Building. The prospective purchasers proposed to form a corporation, the stock of which would be owned 50 percent by Elbel and 50 percent by Charles E. This corporation was to purchase the Twenty West Ninth Street Building and related properties for about $1,500,000. It was finally agreed that the exact price would be determined by the result of an independent appraisal.

Joseph Rule, M.A.I., valued the property at $1,550,000 in an appraisal report dated December 31, 1956. He allocated $1,400,000 as the value of the buildings and $150,000 as the value of the land. Rule advised the parties of the result of his appraisal sometime prior to the submission of the written report. The price of $1,550,000 was within a reasonable range of the fair market value of the property in December 1956.

The articles of incorporation drawn up by the attorneys employed by the parties provided that Elbel and Charles E. would each own 49 percent of the stock and that the remaining 2 percent would be owned by Carolyn. Charles E. objected to this deviation from the original agreement, although he agreed that there should be some provision to prevent a deadlock in case of disagreement between Elbel and himself. Charles E. then suggested that his father, Charles F., would be an appropriate third party to hold a tie-breaking interest. This was agreeable to all concerned. Accordingly, Carolyn assigned her subscription rights to the stock of the new corporation to Charles F.

On December 26, 1956, the aggregate amount of $50,000 was paid to the corporation by the following persons in the respective amounts set forth after their names:

| Name | Amount paid |
| --- | --- |
| Charles E. Curry | $22, 500 |
| Donald R. Elbel | 22, 500 |
| Charles F. Curry | 5, 000 |
| | 50, 000 |

On the same date, the corporation issued 5,000 shares of $10 par value common stock, the entire amount of its authorized capital stock, to the following persons in the respective amounts indicated:

| Name | Number of shares |
|------|------------------|
| Charles E. Curry | 2,250 |
| Donald R. Elbel | 2,250 |
| Charles F. Curry | 500 |
| | 5,000 |

The corporation had not at the time of trial been authorized to issue any additional capital stock of any class. Each shareholder paid the purchase price of his stock out of his own personal funds.

Elbel, Charles E., and Charles F. were elected directors at the first meeting of the shareholders of Twenty West Ninth Corp., on December 21, 1956. At the meeting of directors which immediately followed the stockholders meeting, the following officers were elected:

Donald R. Elbel: President.

Charles E. Curry: Vice president, secretary, and treasurer.

H. A. Seegar:[8] Vice president and assistant secretary.

Carolyn Curry Elbel: Assistant secretary and assistant treasurer.

After certain other formal matters had been attended to, the directors discussed the proposed purchase of the Twenty West Ninth Street properties. The principals had already agreed to the terms of the sale. In due course, it was resolved that the corporation should purchase the Twenty West Ninth Street Building and related properties from the Curry family on the terms embodied in a contract which had been presented and reviewed at the meeting.

The contract referred to in the resolution was executed on December 28, 1956. The contract contained the following provisions pertaining to payment of the purchase price:

4. *PURCHASE PRICE AND METHOD OF PAYMENT:* The aggregate purchase price to be paid to the Sellers by the Buyer for the real estate and improvements sold hereunder is the sum of ONE MILLION FIVE HUNDRED FIFTY THOUSAND DOLLARS ($1,550,000.00), payable as follows:

(a) As a down payment, the sum of FIFTY THOUSAND DOLLARS ($50,000.00) in cash at the signing of this contract, receipt whereof is hereby acknowledged by the Sellers, and

(b) The sum of SIX HUNDRED FIFTY THOUSAND DOLLARS ($650,-000.00) with interest from January 1, 1958, payable semi-annually thereafter, on the unpaid balance from time to time outstanding at the rate of FOUR PER CENT (4%) per annum, payable in TWENTY (20) equal semi-annual principal installments beginning on June 30, 1957 with each succeeding principal installment payable on each December 31 and June 30 thereafter to and including December 31, 1966.

(c) The balance of EIGHT HUNDRED FIFTY THOUSAND DOLLARS ($850,000.00) with interest on the unpaid balance from time to time outstanding

---

[8] Seegar was at the time in the employ of one of the Curry organizations.

at the rate of TWO PER CENT (2%) per annum, said interest payable semi-annually beginning June 30, 1957 and on each December 31 and June 30 thereafter, said principal sum of EIGHT HUNDRED FIFTY THOUSAND DOLLARS ($850,000.00) to be paid in TEN (10) equal annual principal installment payments beginning June 30, 1967 with each succeeding principal installment due and payable on June 30 of each year thereafter to and including June 30, 1976, provided, however, that payment of each principal installment due under this subparagraph shall be waived if and to the extent that the amount of said principal installment otherwise due exceeds:

(i) The preceding calendar year's net profits from the rental, management and operation of the real estate sold hereunder, less

(ii) The sum of:

(aa) Amounts expended for capital improvements to said real estate in the preceding calendar year, out of net profits (current or otherwise) from the operation, management and rental of said real estate, and

(bb) Amounts paid in the preceding calendar year on the principal sum of SIX HUNDRED FIFTY THOUSAND DOLLARS ($650,000.00) as set forth in subparagraph (b) hereof or amounts paid in the preceding calendar year on the principal sum of the commercial first mortgage loan substituted for the payments in said subparagraph (b), all as hereinafter more fully explained.

For the purposes of this subparagraph, "net profits" are hereby defined to be net profits (exclusive of a deduction for depreciation) from the rental, management and operation of the real estate sold hereunder for Federal income tax purposes as determined by the Federal income tax return of the Buyer and any audit of said income tax return by the Internal Revenue Service resulting in a final adjustment to said net profits, less Federal income and excess profits taxes attributable to said net profits.

For purposes of this subparagraph "capital improvements" are hereby defined to be expenditures paid by the Buyer, which are capital additions to the real estate sold hereunder as determined by the Federal income tax return of the Buyer and any audit of said income tax return by the Internal Revenue Service resulting in a final adjustment of said capital improvements.

That portion of any principal installment payment due hereunder which is waived under the foregoing formula shall be due and payable on each succeeding June 30 to the extent that the "net profits" for the prior calendar year, less the amounts computed under (ii) (aa) and (bb) above, exceed the principal installment otherwise due on such succeeding June 30, and in any event shall be due and payable June 30, 1976. Any portion of a principal installment payment waived hereunder which is subsequently finally determined after audit of the Internal Revenue Service to have been incorrect shall be due and payable on the next principal installment due date immediately following such final determination. All installment payments of principal hereunder shall be accompanied by a true copy of the Federal income tax return of the Buyer, and the Buyer shall promptly furnish the Sellers with all detailed information with respect to any final adjustments to said income tax returns arising out of audit by the Internal Revenue Service. Any claims for refund filed by the Buyer and resulting in a final adjustment to net profits and capital improvements as herein defined shall not entitle the Buyer to any adjustment under the foregoing formula.

If the Buyer, as hereinafter permitted, obtains a substitute commercial first mortgage loan secured by a substitute first deed of trust and prepays its obligation under subparagraph (b) hereof, then and in that event, the Buyer hereby obligates itself to prepay the principal sum of EIGHT HUNDRED FIFTY THOUSAND DOLLARS ($850,000.00) on each interest payment date, as provided in

this subparagraph (c), if and to the extent that the principal installment payment and interest due under subparagraph (b) hereof exceeds the total principal installment payments and interest payments made by the Buyer, during the six (6) month period then ending, on the substitute commercial first mortgage loan, provided, however, this obligation to prepay, as provided herein, shall not apply if said substitute commercial first mortgage loan shall mature on or before December 31, 1967.

It is agreed by and between the parties hereto that the payment of this deferred obligation of EIGHT HUNDRED FIFTY THOUSAND DOLLARS ($850,000.00) in the manner hereinabove provided and with the provision for waiver of principal installment payments is in recognition of the fact that the useful life of the buildings on the real estate sold hereunder can be prolonged to TWENTY (20) years from the date of this sale only through the expenditure of an estimated ONE MILLION DOLLARS ($1,000,000.00) in rehabilitation, decoration and physical improvement of said buildings during the last TEN (10) years of said TWENTY (20) year period.

The above-quoted provisions were agreed upon as a result of negotiations among the parties and after consultation with an attorney.

The contract of sale also contained the following paragraph:

6. *ALLOCATION OF PURCHASE PRICE:* The aggregate purchase price for the real estate sold hereunder has been determined by the parties hereto based upon the projected rental value of the buildings on said real estate during the next TWENTY (20) years, it being agreed by the parties hereto that the land separate from the said buildings is marginal in location and therefore has no real substantial value. Based upon these considerations and other consideration of the parties hereto, including independent appraisals of said land separate from said buildings, the parties hereto do mutually agree to the following allocation of the aggregate purchase price between land and buildings and improvements purchased hereunder:

| | |
|---|---|
| Land | $150,000.00 |
| Buildings and improvements | 1,400,000.00 |
| Total aggregate purchase price | 1,550,000.00 |

The allocation was made in good faith.

No sales commission was payable or paid to anyone in connection with the sale to the corporation. After the sale, the Charles F. Curry Real Estate Co. continued to manage the building for the same fee, 5 percent of gross rent collections, as had been paid by the individual owners.

To meet the $50,000 downpayment called for by the contract, the corporation on December 28, 1956, delivered to Charles F., Janet, Charles E., and Carolyn its checks for $15,000, $15,000, $10,000, and $10,000, respectively. On the same date the corporation delivered to the sellers its promissory note in the amount of $650,000, secured by a first deed of trust, and its promissory note in the amount of $850,000, secured by a second deed of trust. The notes and deeds of trust (hereinafter sometimes referred to as the first and second mortgages)

conformed with the above-quoted terms of the sale contract.[9] In addition, each note contained the following clause:

If default be made in the payment of any installment on this note when due and such default shall continue for a period of THIRTY (30) days, then the entire unpaid balance of the principal sum of this note shall immediately become due and payable at the option of a majority in percentage interest of the holders hereof, and said unpaid principal sum shall after said THIRTY (30) day period bear interest at the rate of EIGHT PER CENT (8%) per annum until paid.

In exchange the corporation received from the sellers a warranty deed transferring the Twenty West Ninth Street properties to the corporation. The warranty deed and the first deed of trust were recorded.[10] The second deed of trust was not recorded, in compliance with the following terms of the contract of sale:

Said promissory note representing the deferred obligation of EIGHT HUNDRED FIFTY THOUSAND DOLLARS ($850,000.00) shall be secured by a second deed of trust on the real estate sold hereunder, executed by the Buyer for the benefit of the Sellers, bearing even date herewith and containing the usual provisions for securing payment of said promissory note, and in addition shall provide that said second deed of trust shall remain subordinate to said first deed of trust hereinabove mentioned or to one substitute first deed of trust securing a commercial first mortgage loan of not to exceed SIX HUNDRED FIFTY THOUSAND DOLLARS ($650,000.00), and maturing on or before December 31, 1972.

Due to the fact that by mutual agreement of the parties hereto the promissory note evidencing the deferred obligation of SIX HUNDRED FIFTY THOUSAND DOLLARS ($650,000.00) (Exhibit 1 attached hereto) provides for prepayment of the principal in full at any time without penalty for the purposes of obtaining a commercial first morgage loan secured by a substitute first deed of trust, the Sellers hereby covenant and agree that in order to assist the Buyer in obtaining said commercial first mortgage loan, they will not record said second deed of trust unless Sellers shall at any time reasonably believe their security represented by said second deed of trust shall be in jeopardy, in which event the Sellers may record said second deed of trust.

Elbel and Charles E. believed that the corporation would be able to pay the purchase money obligations by 1976 and that the property would still have substantial value at that time.

Late in 1954, Charles F. Curry & Co. had contacted Pringle-Hurd & Co., Inc., of New York City, in regard to the possibility of obtaining an $800,000 mortgage loan, to be amortized over 15 years with 4½-percent interest, on the Twenty West Ninth Street Building. Pringle-Hurd in turn contacted the Equitable Life Assurance Society. After investigating the property, Marvin C. Holmes, Equitable's Kansas City loan supervisor, informed Pringle-Hurd that Equitable would not be interested in a loan on the building unless the space soon to be

---

[9] An amendment to the $650,000 note stated that, "in consideration of One Dollar ($1.00) and other valuable considerations," interest would be payable from July 1, 1957, rather than from Jan. 1, 1958, as originally provided.

[10] The first deed of trust was recorded on Jan. 2, 1957. There is no evidence as to the date on which the warranty deed was recorded.

vacated by TWA was rerented to a comparable tenant on a reasonably long-term basis. In apparent response to a subsequent inquiry, Holmes informed Charles F. by letter dated April 23, 1957, that Equitable was still not interested in making a loan on the building, inasmuch as most of the major tenants occupied their space under short-term leases.

On December 28, 1956, the individual owners of the Twenty West Ninth Street properties had an aggregate remaining basis of $85,686.02 in the improvements and $20,000 in the land, divided among them in proportion to their respective interests. Upon its acquisition of the properties, the corporation allocated $150,000 on its books as the cost of the land and $1,400,000 as the cost of the improvements.

From the time they were married until the time of trial, Carolyn and Elbel treated Carolyn's separate property and the income therefrom as hers alone. Elbel is neither a trustee nor a beneficiary of the trust to which Carolyn eventually transferred her interest in the mortgage notes executed by the corporation. Similarly, Elbel's property and income are treated as belonging only to him.

The terms of payment called for in the contract of sale between the Curry family and Twenty West Ninth Corp., quoted above, were favorable to the buyer in comparison with the terms of similar transactions financed by institutional investors, such as banks or insurance companies. The cash downpayment of $50,000, or 3.23 percent of the total price of $1,550,000, was small. The interest rates of 4 percent and 2 percent on the first and second mortgages were both less than the "going rate" in December 1956 of about 5 percent. In addition, the provision for waiver of principal payments on the second mortgage, if the cash flow from the property was not adequate to meet expenses (other than depreciation) plus payments on the first mortgage plus capital expenditures plus taxes, was unheard of in loans made by institutional investors.

However, it is usual and common that there be great differences between the terms of a sale financed by an institutional investor and the terms of a sale of the same or similar property financed by noninstitutional sellers through the use of purchase money mortgages. Institutional investors, which are usually subject to some form of governmental regulation, require a safe and steady rate of return. Noninstitutional sellers may be willing and able to take greater risks. Moreover, they are not investing fresh funds in the venture, but are attempting to "cash in" on a nonliquid investment; thus, a rather wide range of terms might be acceptable to them. It is not extraordinary for noninstitutional sellers to accept notes which bear no interest at all.

If the Twenty West Ninth Street properties had been sold for cash on December 28, 1956, at a fair price, the purchase price would have been less than $1,550,000, but considering that the terms of payment in the contract of sale between the Curry family and the corporation were favorable to the buyer, the stated price of $1,550,000 was a reasonable one. All things considered, the terms of sale were fair to buyers and sellers.

The stock of the corporation contained no restrictions on the right of alienation. The shareholders were free to transfer their stock to whomever they might wish. Elbel did in fact transfer his 2,250 shares to a personal holding company on July 18, 1960. On the following day Elbel resigned as a director of the corporation—he then held no office in the corporation—and his shares were transferred to Arizona Savings & Loan Association as part of a settlement of litigation between the association and a number of corporations controlled by Elbel. By July 27, 1960, Arizona Savings & Loan Association had transferred the stock to the Coffeyville Loan & Investment Co., Inc. On November 1, 1962, Mervin S. Rosenberg, not otherwise identified, became the registered owner of the stock originally held by Elbel. Rosenberg remained the registered owner through the trial of this case.

No noteholders were permitted to vote as shareholders at the stockholders meetings of the corporation, nor did any noteholders claim a right so to vote. The corporation has carried the first and second mortgages on its books as "mortgage payable," and has treated the payments to the Currys as payments of principal and interest.

For each of the years 1945–56, the Twenty West Ninth Street properties produced the indicated net cash flow:[11]

| Year | Gross income | Cash expenses [1] | Net cash flow |
|------|-------------|-------------------|---------------|
| 1945 | $151,802.39 | $97,413.64 | $54,388.75 |
| 1946 | 209,208.18 | 106,653.71 | 102,554.47 |
| 1947 | 243,578.98 | 114,982.63 | 128,596.35 |
| 1948 | 245,671.52 | 135,273.14 | 110,398.38 |
| 1949 | 258,551.21 | 145,329.38 | 113,221.83 |
| 1950 | 260,778.90 | 147,189.69 | 113,589.21 |
| 1951 | 267,121.36 | 154,539.16 | 112,582.20 |
| 1952 | 277,085.61 | 175,804.87 | 101,280.74 |
| 1953 | 278,942.86 | 170,157.14 | 108,785.72 |
| 1954 | 283,389.39 | 171,596.28 | 111,793.11 |
| 1955 | 296,549.34 | 183,945.74 | 112,603.60 |
| 1956 | 331,326.48 | 208,866.96 | 122,459.52 |

[1] Excluding interest.

[11] When used in this opinion in connection with the unincorporated properties, "net cash flow" means net income computed without allowance for depreciation, interest or principal payments on mortgages, capital expenditures, or personal income taxes of the owners. When used in connection with the corporation, "net cash flow" means net income computed without allowance for the foregoing items and without allowance for corporate income taxes. Although an allowance for corporate income tax actually paid by the corporation is made in Exhibit 34 to arrive at the "cash flow" there, it is believed that our definition is more informative for purposes of comparison with the period of individual ownership.

After the transfer of the properties to the corporation, they produced net cash flow [12] as follows:

| Year | Gross income | Cash expenses [1] | Net cash flow |
|------|-------------|-------------------|---------------|
| 1957 | $355,265.22 | $218,223.72 | $137,041.50 |
| 1958 | 360,834.90 | 225,273.73 | 135,561.17 |
| 1959 | 326,684.74 | 201,977.30 | 124,657.44 |
| 1960 | 300,976.70 | 191,486.72 | 109,489.98 |
| 1961 | 329,499.36 | 212,734.28 | 116,765.08 |
| 1962 | 370,909.52 | 234,454.35 | 136,455.17 |

[1] Excluding interest and Federal taxes.

During the period 1957–62, the corporation made capital expenditures totaling $214,149.82, made up largely of 1957,[13] 1959, and 1961 expenditures of $77,059.80, $76,879.06, and $47,130.75, respectively. Chiefly as a result of having made such capital expenditures, the corporation was unable to meet in full the principal payments required by the purchase money mortgages. The noteholders, i.e., the Curry family, then agreed to a temporary postponement of such payments so long as and to the extent that the corporation used the net cash flow after taxes for capital improvements required by the various leases.

The corporation made payments in the years 1957–62 to the Curry family [14] in the aggregate amounts and with the designations indicated:

| Year | Principal on first deed of trust | Interest on first deed of trust | Interest on second deed of trust |
|------|----------------------------------|--------------------------------|----------------------------------|
| 1957 | $65,000.00 | $12,700.00 | $17,000.00 |
| 1958 | 65,000.00 | 22,750.00 | 17,000.00 |
| 1959 | 30,000.00 | 20,300.00 | 8,500.00 |
| 1960 | 26,500.00 | 19,350.00 | 25,500.00 |
| 1961 | 53,028.34 | 8,971.66 | 17,000.00 |
| 1962 | 67,971.66 | 23,502.45 | 17,000.00 |

[12] See fn. 11, *supra*. The corporation reported liability for Federal income taxes for the years 1957–62 in the following amounts:

| Year | Reported liability | Year | Reported liability |
|------|--------------------|------|--------------------|
| 1957 | $4,479.02 | 1960 | [1] 0 |
| 1958 | 516.78 | 1961 | $1,051.07 |
| 1959 | 154.66 | 1962 | 4,157.96 |

[1] Reported net operating loss of $20,453.52.

Of course, the liability for 1957 and 1958 is subject to our determination in this proceeding; and it is likely that the liabilities for subsequent years will also be affected.

[13] The 1957 expenditures reflected the requirements of the A.T. & T. lease that parts of the building be centrally air conditioned.

[14] Separate payments were made to Charles F., Janet, Charles E., and Carolyn in proportion to the respective undivided interests of each.

Principal payments on the first mortgage were overdue in the amount of $82,500 at the end of 1962. During the first 3 months of 1963, the corporation made additional principal payments on the first mortgage of $46,000.

In 1957, the corporation borrowed money from General Motors Acceptance Corp. (GMAC) to pay for air-conditioning equipment installed in the Twenty West Ninth Street Building. On that occasion the noteholders executed instruments subordinating their liens on the property to the chattel mortgage held by GMAC.

From the time of its formation to the time of trial, the corporation paid no dividends to its shareholders, nor did it pay any salaries to its officers.

The parties to the sale of the Twenty West Ninth Street properties to the corporation intended to and did create a bona fide debtor-creditor relationship between the corporation and the noteholders.

In the income tax returns of Charles F. and Janet, Charles E., and Carolyn for the calendar year 1956, the transfer of the Twenty West Ninth Street properties to the corporation was reported as a sale of a capital asset held for more than 6 months. Each of the taxpayers elected the installment method of reporting the gain attributable to his respective proportionate interest. Consistently with such election, each reported as long-term capital gain for 1956 a percentage of his share of the $50,000 cash downpayment made by the corporation on December 28, 1964.

On their returns for 1957 and 1958, Charles F. and Janet, Charles E., and Carolyn each reported as long-term capital gain from an installment sale a percentage of the payments designated as "principal on first deed of trust" received by them from the Twenty West Ninth Corp. They each reported as interest income the amounts paid to them by the corporation under the designations "interest on first deed of trust" and "interest on second deed of trust."

On its returns for the calendar years 1957 and 1958, Twenty West Ninth Corp. stated the cost of the improvements to the property it had purchased from the Curry family as $1,400,000. The corporation took deductions for depreciation of said improvements under the declining-balance method of depreciation at 150 percent of the straight-line rate of 4 percent, claiming a useful life of 25 years.

In his notices of deficiency to Charles F. and Janet, Charles E., and Carolyn, respondent determined that no gain or loss resulted from the 1956 transfer of the Twenty West Ninth Street properties to the corporation. Accordingly, he eliminated from gross income the amounts which the individual petitioners had reported in 1956,

1957, and 1958 as long-term capital gains from an installment sale.[15] Respondent also determined that the amounts reported in 1957 and 1958 as interest paid by the corporation did not constitute interest income. Instead, respondent determined that the payments, designated as principal and interest on the first deed of trust and interest on the second deed of trust, made by the corporation to the members of the Curry family in 1957 and 1958 constituted dividend income to the recipients.

In his notice of deficiency to Twenty West Ninth Corp., respondent disallowed the basis of $1,400,000 claimed by the corporation for the improvements transferred to it by the Curry family. He reduced such basis to $85,686.02, the net remaining basis of the improvements in the hands of the individual petitioners prior to the transfer to the corporation; accordingly, he disallowed the major part of the depreciation deductions claimed by the corporation in 1957 and 1958. In addition, respondent disallowed as interest deductions the amounts paid to Charles F., Janet, Charles E., and Carolyn under the terms of the December 28, 1956, contract and promissory notes. In explanation of his disallowances for each of the years 1957 and 1958, respondent determined merely that "it has not been established that the amount * * * constitutes an ordinary and necessary business expense or was expended for the purpose designated."

## OPINION

Respondent contends that the organization of the corporation and the transfer to it of the Twenty West Ninth Street properties were interdependent steps in a transaction governed by section 351 of the Code. Respondent's primary position is that the notes received by Charles F., Janet, Charles E., and Carolyn are substantially equivalent to stock in the corporation. Accordingly, respondent has determined that the purported payments of principal and interest on the notes were dividends to the recipients. He has likewise disallowed as deductions of the corporation those portions of the payments denominated as interest. Furthermore, he has disallowed the major portion of the corporation's depreciation deduction, on the theory that section 362 prescribes a basis for the corporation equal to the basis of the individual owners immediately prior to the transfer.

Respondent's alternative positions are that at least one of the two notes is either "stock" or a "security," as those terms are used in

[15] As a result of this adjustment, respondent determined that overassessments had been made of the 1956 tax liability of each of the individual petitioners. Accordingly, issues relating to the tax due for 1956 are not before us except to the extent necessary to our redetermination of the deficiencies for 1954, 1955, 1957, or 1958.

section 351. If so, then, according to respondent, the transaction is still governed by section 351.

Petitioners contend that the transfer of December 28, 1956, was a taxable sale of the property, that the notes executed by the corporation were neither "stock" nor "securities," and that section 351 is not to be applied here. They assert the correctness of their treatment of the transaction.

*I*

We deal first with the issue of whether the purported payments of interest by the corporation to the members of the Curry family are to be treated for tax purposes as dividends. This will also dispose of the question of whether the notes are to be treated as stock in applying section 351, since the same standards are applicable there as in other debt-equity areas. See *J. I. Morgan, Inc.*, 30 T.C. 881 (1958), acq. 1959-1 C.B. 4, reversed on another issue 272 F. 2d 936 (C.A. 9, 1959); *Warren H. Brown*, 27 T.C. 27 (1956), acq. 1957-2 C.B. 4; *Gooding Amusement Co.*, 23 T.C. 408 (1954), affd. 236 F. 2d 159 (C.A. 6, 1956), certiorari denied 352 U.S. 1031 (1957); 3 Mertens, Law of Federal Income Taxation, sec. 20.47, p. 119 (Zimet & Weiss Rev. 1957).

In determining this question, we are faced with the always difficult task of deciding whether instruments which on their face appear to be debt obligations shall be recognized as such for tax purposes. There is, of course, no single test to be applied in inquiries of this kind. *John Kelley Co.* v. *Commissioner*, 326 U.S. 521 (1946). We must instead consider and weigh all the relevant factors, and combine them into an overall evaluation of the instruments involved. *Gooding Amusement Co.*, *supra*, 236 F. 2d at 165. Such an evaluation is essentially factual, with the burden being upon the taxpayer to prove the existence of bona fide indebtedness. *Gilbert* v. *Commissioner*, 262 F. 2d 512 (C.A. 2, 1959), affirming a Memorandum Opinion of this Court.

In support of their respective contentions respondent and petitioners each rely on a number of factors. In form, the instruments are clearly debt. They contain an unconditional promise to pay interest and installments of principal on designated dates. The holders have the right to declare the entire balance due if the corporation defaults for 30 days in the payment of an installment.[16] The notes recite that they represent a portion of the balance due on the purchase price of certain real estate in Kansas City, Mo., and are secured by deeds of trust on that real estate. The first deed

---

[16] That the vote of a majority in percentage interest is required to declare a default is not significant where, as here, foreclosure of the security interest would materially affect the rights of all the noteholders. *Luden's, Inc.* v. *United States*, 196 F. Supp. 526, 533 (E.D. Pa. 1961).

of trust was recorded. While form is certainly not controlling, it is relevant and entitled to some weight. *Crawford Drug Stores* v. *United States*, 220 F. 2d 292 (C.A. 10, 1955).

A cogent factor supporting debt treatment is the disproportion between stock ownership and note ownership. Janet and Carolyn, owning 30-percent and 20-percent interests, respectively, in the notes, owned no stock at all. Charles F., holder of a 30-percent interest in the notes, owned only 10 percent of the stock of the corporation. Charles E., a 45-percent shareholder, had only a 20-percent interest in the notes. Finally, Elbel, who owned the remaining 45 percent of the stock during the years in issue, had no interest in the notes.

Consequently, upon final payment of the two notes, two of the original owners will have completely terminated their financial interests in the corporation and its property. Assuming that Charles F. and Charles E. retain their stock, they will have changed their positions significantly. Charles F. will have a much smaller interest, Charles E. a much larger one. The substantial changes in ownership which are taking place as the notes are paid strongly support the contention of the petitioners that the transfer to the corporation was intended to and did constitute a sale of the property, and that the notes are representative of a bona fide indebtedness arising from such sale.[17]

Respondent contends that, inasmuch as both the sellers and the original shareholders of the purchasing corporation were members of the same family group, the entire transaction was merely a device to secure tax advantages without fundamentally altering the nature of the ownership of the property. We disagree. The record convinces us that the parties, particularly Charles F., Charles E., and Elbel, who were and are highly knowledgeable real estate men, dealt with one another in this matter at arm's length. The record shows that all, with the possible exception of Janet, were capable of independent action.

It is significant that there were no restrictions on the alienability of the stock of the corporation, not even a right of first refusal. Elbel in fact transferred his stock to an unrelated third party in 1960. Consequently, 45 percent of the enhancement in value of the stock resulting from increases in the corporation's equity in the properties accrues to the benefit of an outsider. Thus, this transaction consisted of more than just shuffling papers around. See *Gregory* v.

---

[17] When we use the term "sale" or a "bona fide sale" in this context, we refer to a transfer of title combined with an extinction of the transferor's equity interest in the property transferred in exchange for a consideration equal in value to the property transferred. We recognize that, broadly speaking, a transfer of title to a corporation in exchange for stock in the corporation may also be considered a "sale." We prefer, however, to characterize such a transaction as a change in the form of ownership, restricting the term "sale" to the narrower definition given above.

*Helvering*, 293 U.S. 465 (1935). The fact that the petitioners were conscious of the tax benefits of the transaction is not fatal to their case, although it is reason for us to subject the *bona fides* of the arrangement to careful scrutiny. *Gregory* v. *Helvering, supra.*

Both petitioners and respondent urge that the course of negotiations between the Currys and Zoline serves to support their respective positions. On the one hand, the submission of a contract to Zoline indicates that the owners were willing to part with the building on terms which they considered favorable. Furthermore, the fact that Zoline offered to purchase the building on terms basically similar to those eventually adopted by the petitioners is evidence that an arrangement of that kind was advantageous to the buyer, and not only to the sellers. Nor is it irrelevant that the transaction with which we are concerned was inspired by proposals from an unrelated party to consummate a bona fide sale. It was natural for the parties, having been introduced to the benefits associated with a bona fide sale, to continue to plan within that framework. The development of the proposal for a joint purchase of the property by Elbel and Charles E. out of Elbel's earlier interest in purchasing the property for himself on the terms offered by Zoline is further proof that the parties intended a bona fide sale and not a mere shifting in the form of ownership to secure tax advantages.

On the other hand, the Zoline offers were rejected by the Currys. The oral second offer provided for a cash downpayment of $50,000, a first mortgage of $800,000, and a second mortgage of $650,000. The downpayment was to be used to pay Kanan and Van Sickle their commissions. The first mortgage was to be refinanced by a 10- or 15-year commercial first mortgage in the same amount, the $800,000 proceeds being paid over to the sellers. Payments of principal and interest (at the rate of 4 or 4½ percent) on the second mortgage would not be in default to the extent that and so long as the net cash flow after taxes was being used to make capital improvements to the property and meet the obligations under the first mortgage. The offer was contingent upon the obtaining of a commitment from an institutional investor to refinance the first mortgage.

The reasons given by the petitioners at trial for rejecting this offer were (1) that no substantial corporation would be permanently liable on the second mortgage, (2) that interest as well as principal payments on the second mortgage could be deferred, and (3) that the renewal of the TWA lease was endangered by the lack of assurance by Zoline that additional sums would be available for improvements to the property. Moreover, the likelihood in late 1953 and early 1954 of obtaining a commitment from an institutional investor to refinance an $800,000 first mortgage was somewhat doubtful.

In concluding the terms of the transfer, the petitioners did nothing to eliminate the first objection. The obligation of the corporation added very little to the sellers' security interests in the property. The second objection was partially met by providing that only the principal payments on the second mortgage could be deferred by reason of the corporation's shortage of cash. However, interest on the second mortgage was reduced from 4 or 4½ percent of $650,000 to 2 percent of $850,000. The third objection had been rendered moot before the period of serious negotiations among the petitioners by TWA's decision in 1955 not to renew its lease. The decision to have a $650,000 first mortgage apparently was an attempt to increase the chances for successful refinancing. It appears as though the short terms of the major leases made such refinancing unavailable.

Respondent argues that the failure to correct *all* of the objectionable terms of the Zoline offer shows that the transaction entered into among the petitioners was not what it appeared to be. We are, however, unaware of any rule of law which makes rejection of an offer to sell on certain terms a bar to a subsequent bona fide sale on the same or similar terms, even where related parties are involved. We have carefully scrutinized the evidence relating to the transfer of the Twenty West Ninth Street Building from the Curry family to the corporation. We believe that the petitioners intended to consummate a bona fide sale. Our conclusion that the parties intended the transaction to be a sale has an important bearing on the ultimate question of whether the notes are to be treated as debt or equity. A sale not only establishes a *raison d'être* for indebtedness, but it also is some indication that the sellers originally intended to enforce the notes. Compare *Gooding Amusement Co., supra.*

Respondent cites *Gooding Amusement Co., supra*, for the proposition, "The Courts require a creditor to act as a creditor." Respondent argues that normal creditor safeguards were not complied with when postponement of principal payments on the first mortgage was permitted to the extent that the corporation's cash position was insufficient to meet the required payments.

In the *Gooding* case, the operating assets of a family partnership were transferred by the partners to a new corporation in exchange for common stock and $232,000 in 5-percent notes maturing serially in from 1 to 5 years. Both stock and notes were received in proportion to the transferor's interest in the partnership, four-sevenths to the husband, two-sevenths to the wife, and one-seventh to the baby daughter. Most of these notes remained unpaid, some for more than 6 years, despite repayment of subsequent loans from the partners and outside sources, and despite the payment of some dividends. We found that the wife and daughter did not contemplate action inde-

pendent of the husband, and that the husband never intended to enforce payment of the notes if doing so would risk the corporation's credit rating. The husband even testified that it was not important to the family when the notes were repaid. We held that the notes issued to the family members were to be treated as equity for tax purposes.

The actions of the mortgagees in the instant case were significantly different from the actions of the noteholders in *Gooding*. Here, the corporation made substantial principal payments in each of the years for which we have data. Even though the corporation was permitted to fall $85,000 behind the scheduled payments of $335,000 by the end of 1961, the corporation's cash shortage was caused chiefly by the necessity for expending large amounts for capital improvements, which in turn served to enhance the value of the mortgagees' security. The mortgagees viewed the need for this moratorium as a temporary phenomenon. We believe that the mortgagees would have reacted quite differently to the prospect of a permanent decline in the earning capacity of the corporation.[18]

Respondent contends that the subordination of their prior lien to the chattel mortgage under which the corporation purchased air-conditioning equipment is further evidence that the mortgagees did not intend to utilize normal creditor safeguards. In so contending, respondent disregards the realities of the transaction. As a general rule, the majority of the States, including Missouri, give priority to a chattel mortgagor of personal property affixed to real estate over the holder of a mortgage on the realty. 5 American Law of Property, sec. 19.12 (Casner ed. 1952). See *Globe Automatic Sprinkler Co.* v. *Boester*, 231 Mo. App. 203, 95 S.W. 2d 825 (1936). If, however, removal of the personalty would result in substantial damage to the real estate, it is held that the personalty has acceded to the realty. Where such an accession has taken place, the rights of the chattel mortgagor are subordinated to those of the real estate mortgagor. 5 American Law of Property, sec. 19.12, *supra; Globe Automatic Sprinkler Co.* v. *Boester, supra.*

In *Globe Automatic Sprinkler Co.* v. *Boester*, it was held that a sprinkler system had acceded to the building in which it was installed, with the result that the vendor lost its right to enforce its lien against the sprinkler system.

In view of the foregoing, the failure of GMAC to seek the consent of the Currys to the subordination of their lien would have amounted to imprudence, since there is an obvious similarity between a sprinkler system and a central air-conditioning system. Had the Currys

---

[18] We defer to a later part of the opinion our consideration of the postponement provisions of the second mortgage.

withheld their consent, it is likely that GMAC would not have made the loans sought by the corporation. Since they in fact gave their consent, the sellers obviously approved the purchase. As a practical matter, executing the subordination agreement meant that the Curry family would have to pay the amount due to prevent removal of the equipment in case of default by the corporation. To the extent the corporation paid the loan, the value of the realty, and hence the security of the sellers, was enhanced. Since, as we have found, the Curry family was optimistic about the long-range prospects of the corporation, we think it clear that execution of the subordination agreement in 1957 did not indicate any intention on the part of the Curry family to forego the rights of bona fide creditors.

Respondent argues that the existence of irregularities in the payment of interest supports a conclusion that the noteholders did not act as creditors. Respondent asserts that the payment of interest on the first mortgage in 1957 was a prepayment, since under the terms of the original promissory note interest was payable from January 1, 1958. This note was amended, however, to make interest payable from July 1, 1957. The amendment recites that it was made for valuable consideration; it appears properly executed and otherwise valid. We are loath to ignore it on the basis of respondent's bare assertion, made for the first time on post trial brief, that the corporation prepaid the interest on the note.

One installment of interest on the second mortgage was not paid in 1959, the deficiency being rectified in 1960. Similarly, an installment of interest on the first mortgage due in 1961 was paid in 1962. Since one semiannual installment was due December 31, a delay of a few days could explain these discrepancies. The record does not disclose the dates of payment, but only the annual amounts paid under each category. Even assuming that payments in these two instances were substantially in default, we consider the fact to be of minor significance. All other interest installments were paid in the years when due and apparently were timely. The two defaults were cured within 1 year. This constituted adequate compliance with arm's-length standards.

Respondent points to the existence of a high initial ratio of debt to stated capital as evidence that the notes in fact represent equity. It is of course true that the ratio of debt to equity is one of the factors the courts have considered in trying to determine when purported indebtedness was bona fide. The ratio here of 1,500,000: 50,000, or 30:1, is somewhat high, although debt has been found in cases where the ratio was as high as 19:1, 50:1, and 310:1 respectively in *Arthur V. McDermott*, 13 T.C. 468 (1949), acq. 1950–1 C.B.

3; *J. I. Morgan, Inc.*, *supra;* and *Sun Properties* v. *United States*, 220 F. 2d 171 (C.A. 5, 1955). We note also that the $50,000 invested in the stock of the corporation is a substantial sum. Furthermore, there was substantial disproportion between holdings of stock and notes. But the principal answer to respondent's argument is that the transfer of the Twenty West Ninth Street Building to the corporation constituted a bona fide sale. The fact that the sellers were willing to accept a security interest in the property as virtually their sole assurance of payment cannot, under the circumstances of this case, convert to stock what the parties truly intended to be debt. Cf. *Commissioner* v. *Johnson*, 267 F. 2d 382, 385 (C.A. 1, 1959).

Respondent also finds evidence that the notes should be treated as stock in the fact that the notes were issued in exchange for the basic assets of the corporation. Whether or not we would give weight to this factor in a different context,[19] we believe it is insignificant where, as here, the parties intend a sale and the corporate debtor is used as an instrument of the buyers, Elbel and Charles E., to acquire title to the property.

Respondent seeks to draw an inference that debt was not intended from the fact that the interest rate of 2 percent on the second mortgage note[20] was below the "going rate" in December 1956. Although the fact is consistent with respondent's position, the preponderance of the record evidence compels the conclusion that the notes represent true debt.

The evidence concerning the attempts of the Currys to sell the Twenty West Ninth Street properties clearly indicates that a basic price of $1,500,000 was the central feature of every plan. That was the price quoted to a New York broker in October 1953. The one stable element of the several offers and counteroffers made during the negotiations with Zoline and Van Sickle was the $1,500,000 price; the terms and conditions of payment constituted the variable factors. It is not surprising, then, that the final contract of sale, worked out by the petitioners after negotiations which extended over a period of months, called for a purchase price of $1,500,000 (later changed to $1,550,000 as a result of Rule's appraisal). We are satisfied that the interest rates were bargained for and agreed upon in good faith,[21] and not set merely to manipulate the tax incidents of the sale. Cf. Rev. Rul. 63–57, 1963–1 C.B. 103.

---

[19] Compare *Daytona Marine Supply Co.* v. *United States*, an unreported case (S.D. Fla. 1961, 7 A.F.T.R. 2d 1650, 61–2 U.S.T.C. par. 9523), and cases there cited.

[20] Even though the deed of trust securing this obligation was subordinate to the first deed of trust, the effect of the two notes, with payments due consecutively, was much the same as a single 20-year mortgage.

[21] See *Kingsford Co.*, 41 T.C. 646 (1964), acq. 1964–2 C.B. 6. Cf. *Clay B. Brown*, 37 T.C. 461 (1961), affd. 325 F. 2d 313 (C.A. 9, 1963), certiorari granted 377 U.S. 962 (1964).

The same is true of the provision in the second mortgage note postponing principal payments to the extent the payment due exceeds the difference between the corporation's net cash flow after taxes and capital expenditures for the prior year. Inasmuch as this clause makes the schedule of principal payments during the second 10-year period dependent upon earnings and capital expenditures, it provides support for respondent's contention that the second mortgage note was intended to represent a type of equity interest. Nevertheless, evaluating this provision in conjunction with the other terms of the instrument and in light of the surrounding circumstances, we feel the petitioners have satisfied their burden of proving the existence of a debtor-creditor relationship. Among the factors which serve to counterbalance the influence of the postponement provision are the following: Interest payments remain independent of earnings or capital expenditures; there is a fixed and absolute maturity date beyond which no payment may be postponed; the corporation's obligation is secured by a deed of trust on the property (which deed of trust may, under the terms of the contract, be recorded if the sellers believe their security to be in jeopardy and anytime after the first mortgage is either refinanced or paid); a provision of this type was first suggested by Zoline in 1953. Moreover, it is apparent that the buyers were in need of some protection against loss of their investment because of temporary inability to meet the payments required by the contract. In view of the optimism of both buyers and sellers about the prospects of the corporation, we may forgive the sellers for a degree of imprudence in agreeing to a clause which, should the business of the corporation take a serious turn for the worse, will prevent their realizing fully on their security interest before 1976, as long as interest is paid when due. It seems clear that this provision represented one of several accommodations made necessary by the conflicting interests of sellers and buyers. That the noteholders took a certain degree of risk does not mean they had no reasonable expectation of being repaid. The notes were secured; the income from the property seemed safe. The risk appears to have been a good one. Compare *Byerlite Corporation* v. *Williams*, 286 F. 2d 285, 292 (C.A. 6, 1960); *Commissioner* v. *Johnson, supra*.

Respondent asserts that the fair market value of the Twenty West Ninth Street properties on December 28, 1956, was considerably less than $1,550,000, and that this provides evidence of attempted tax avoidance. We have made no specific finding as to the fair market value, since such a finding is unnecessary to our decision. This is not a case where the parties intentionally set a price higher than

the fair market value in order to secure tax benefits. Nor is it one where the price grossly exceeded the fair market value.[22] Cf. *Royal Farms Dairy Co.*, 40 T.C. 172, 185 (1963), on appeal (C.A. 9). We have found that the terms of sale were fair to both sellers and buyers. Even if, as respondent contends, the *nunc pro tunc* appraisals by respondent's experts are more accurate than Rule's contemporary appraisal, the latter was made in good faith and was relied upon by the parties as a check upon their own judgment. The fact that a fair cash price for the property in December 1956 would have been less than $1,550,000 is of little significance. There is quite a difference between a cash sale and a sale on terms. *Kingsford Co.*, 41 T.C. 646, 659 (1964), acq. 1964–2 C.B. 6.

The main building, despite its age, was very well built and was adaptable to the needs of tenants seeking large or small offices. Reasonable minds well might differ over the value to be assigned such a property, especially in view of the revitalization taking place in downtown Kansas City in December 1956. The price and terms were within the range of reason. Compare *Royal Farms Dairy Co.*, *supra* at 185. For similar reasons, we sustain the allocation between land and buildings made by the parties in the contract of sale.

Other factors relied upon by respondent are not significant in this case. The fact that dividends were not paid by the corporation is of little importance here.[23] Nonpayment of dividends is a characteristic of the common stocks of many successful corporations, including some whose stock is listed on national stock exchanges. Such stocks offer the prospect of long-term appreciation in value, which, when realized, is taxed only at capital gains rates. Charles E. and Elbel were both knowledgeable real estate men. We cannot say that they were unreasonable in believing, as they did, that the Twenty West Ninth Street properties would still have substantial value at the time the purchase money obligations were satisfied. As experts in their

---

[22] The record contains a great deal of evidence as to the fair market value of the Twenty West Ninth Street properties in December 1956. This evidence concerned, *inter alia*, the prospects of the area in which the property is located, the effects of the redevelopment of downtown Kansas City, the relative merits of stability of income from long-term leases versus the flexibility and higher turnover resulting from short-term leases, proper rates of return on investment and rates of capitalization, use of reserves for depreciation, and comparable properties. We do not believe it would be worthwhile to burden an already long opinion with our reasons for finding that the price set in the contract of sale was within a reasonable range of the fair market value of the property.

[23] Respondent cites *R. C. Owen Co.* v. *United States*, 149 Ct. Cl. 96, 180 F. Supp. 369, certiorari denied 363 U.S. 819 (1960), and *Brake & Electric Sales Corporation* v. *United States*, 185 F. Supp. 1 (D. Mass. 1960), affd. 287 F. 2d 426 (C.A. 1, 1961), as cases where nonpayment of dividends was considered significant. It is clear from reading the opinions in these cases that this factor was used as a mere makeweight. In both cases the courts relied principally on other evidence to conclude that true intention to create a debtor-creditor relationship was lacking. These cases are clearly distinguishable.

own right, the buyers' opinions are entitled to great weight.[24] Moreover, the offer by Zoline, an outsider, to buy on similar terms is cogent evidence of the reasonableness of the terms. The prospects of the building had, if anything, improved between December 1953 and December 1956.

Respondent points out that no salaries were paid to the corporation's officers or directors. However, the day-to-day operations of the corporation were conducted by the Charles F. Curry Real Estate Co. for a fee of 5 percent of gross rent collections. (This real estate company provided the same service at similar rates to the owners of more than 20 other buildings in Kansas City.) The officers and directors performed little in the way of services for the corporation to justify payment of salaries. They certainly did not perform such substantial services that the failure to compensate them can be considered significant.

Respondent contends there was no "business purpose" for the sale to the corporation. It would seem that the mere desire to sell, even if the sole purpose was to realize capital gains, should be a sufficient business purpose (assuming always that the substance complies with the form). *Sun Properties* v. *United States, supra.* Indeed, it is difficult to imagine what added business purpose respondent would require for a sale of property.

We have reviewed all the evidence relating to the transfer of the Twenty West Ninth Street properties from the Currys to the corporation. Because of the family relationships involved, the parties' consciousness of the tax benefits, and the presence of some unusual terms in the arrangement, we have subjected the transaction to careful scrutiny. We nevertheless believe that the purpose of the transaction was to effect a sale of the property to Elbel and Charles E., and that the parties intended to create a bona fide debtor-creditor relationship between the corporation and the members of the Curry family. We hold that the petitioners have carried their burden of proving the existence of indebtedness. Accordingly, the payments denominated as interest on the two mortgages are to be recognized as such for tax purposes; the payments of principal are not to be treated as dividends; and the notes are not to be treated as stock for purposes of applying section 351.

---

[24] Respondent would have us take the recitation in the contract of sale that "the useful life of the buildings on the real estate sold hereunder can be prolonged to TWENTY (20) years from the date of this sale only through the expenditure of an estimated ONE MILLION DOLLARS ($1,000,000.00) in rehabilitation, decoration and physical improvement of said buildings during the last TEN (10) years of said TWENTY (20) year period" as an admission that the parties thought the buildings would be obsolete at the end of 20 years. We think the proper interpretation of this clause is that the parties believed the buildings would become obsolete without the expenditure of substantial sums, but that with such expenditure the useful life of the buildings could be extended to *and beyond* 20 years.

*II*

The only remaining question is whether section 351 and section 362 [25] apply to the sale of the Twenty West Ninth Street properties to the corporation. It is respondent's position that even if, as we have held, the notes given by the corporation were not stock, section 351 still applies. He reasons that the notes were "securities," and that the seller-noteholders are includable in the same group of "transferors" as the stockholders of the corporation because the transfers of realty for notes and cash for stock were interdependent steps of a single plan. Petitioners contend that the transfer of cash for stock should be treated as separate from the transfer of realty for notes, and that the control test of section 351 was not met in the latter transfer. Petitioners also contend that the notes were not "securities" within the meaning of section 351.

The question of the application of section 351 (or its predecessor in the 1939 Code, sec. 112(b)(5)) to a transfer of property to a corporation for indebtedness, where the transaction was held to be a bona fide sale, has arisen in a number of cases. *J. I. Morgan, Inc., supra; Harry F. Shannon*, 29 T.C. 702 (1958); *Warren H. Brown*, 27 T.C. 27 (1956), acq. 1957-2 C.B. 4; *Ainslee Perrault*, 25 T.C. 439 (1955), affirmed on other issues per curiam 244 F. 2d 408 (C.A. 10, 1957). Cf. *Sun Properties* v. *United States, supra; Ainsworth* v. *United States*, an unreported case (E.D. Wis. 1960, 6 A.F.T.R. 2d 5061, 60-2 U.S.T.C. par. 9595); *Sarkes Tarzian, Inc.* v. *United States*, 159 F.

---

[25] SEC. 351. TRANSFER TO CORPORATION CONTROLLED BY TRANSFEROR.

(a) GENERAL RULE.—No gain or loss shall be recognized if property is transferred to a corporation by one or more persons solely in exchange for stock or securities in such corporation and immediately after the exchange such person or persons are in control (as defined in section 368(c)) of the corporation. For purposes of this section, stock or securities issued for services shall not be considered as issued in return for property.

(b) RECEIPT OF PROPERTY.—If subsection (a) would apply to an exchange but for the fact that there is received, in addition to the stock or securities permitted to be received under subsection (a), other property or money then—

(1) gain (if any) to such recipient shall be recognized, but not in excess of—

(A) the amount of money received, plus

(B) the fair market value of such other property received; and

(2) no loss to such recipient shall be recognized.

SEC. 362. BASIS TO CORPORATIONS.

(a) Property Acquired by Issuance of Stock or as Paid-In Surplus.—If property was acquired on or after June 22, 1954, by a corporation—

(1) in connection with a transaction to which section 351 (relating to transfer of property to corporation controlled by transferor) applies, or

(2) as paid-in surplus or as a contribution to capital,

then the basis shall be the same as it would be in the hands of the transferor, increased in the amount of gain recognized to the transferor on such transfer.

SEC. 368. DEFINITIONS RELATING TO CORPORATE REORGANIZATIONS.

(c) CONTROL.—For purposes of part I (other than section 304), part II, and this part, the term "control" means the ownership of stock possessing at least 80 percent of the total combined voting power of all classes of stock entitled to vote and at least 80 percent of the total number of shares of all other classes of stock of the corporation.

Supp. 253 (S.D. Ind. 1958). In none of the foregoing cases was section 351 (or sec. 112(b)(5) of the 1939 Code) held applicable.

In *Harry F. Shannon, supra*, we held, at respondent's urging, that the transfer in question was a sale and that section 112(b)(5) did not apply to a sale. The nonapplicability of section 351 appears to have been assumed in all the cases cited in the preceding paragraph. This rule appears so well settled that we would not feel justified in overturning it even if we were convinced it be erroneous. However, we are not so convinced.

If respondent's position were adopted, section 351 would apply even where an unrelated third party was the stockholder of the corporation. Assume, for example, a transaction identical to that involved in the instant case except that A.T. & T. was the sole shareholder of Twenty West Ninth Corp. We cannot believe that Congress intended nonrecognition of gain in such a case. Indeed, respondent would undoubtedly be quick to object if taxpayers tried to prevent recognition by such a device. Yet it is clear that, in a sale effected in this manner, the transfers of cash for stock and property for notes are interdependent steps of a single plan. It is not a ground for distinction that two of the stockholders in the instant case were also transferors of realty, since we have found the parties were capable of independent action and intended a bona fide sale.

We have considered the cases cited by respondent, but they are factually distinguishable and are not controlling. In view of our conclusion that section 351 does not apply to this sale, we find it unnecessary to consider petitioners' argument that the notes are not "securities" as that term is used in section 351.

> *Decision will be entered for the petitioner in docket No. 2656-62.*
>
> *Decisions will be entered under Rule 50 in docket Nos. 2655-62, 2657-62, and 2741-62.*