Arthur M. Rosenthal and Fay G. Rosenthal v. Commissioner. Paducah Co., Inc., Transferee v. Commissioner.
Rosenthal v. Commissioner
Docket Nos. 2609-63, 2610-63.
United States Tax Court
T.C. Memo 1965-254; 1965 Tax Ct. Memo LEXIS 75; 24 T.C.M. (CCH) 1373; T.C.M. (RIA) 65254; September 21, 1965
Marvin S. Shapiro and Louis M. Brown, for the petitioners. J. Earl Gardner, for the respondent. FAY
Memorandum Findings of Fact and Opinion FAY, Judge: The Commissioner determined deficiencies in income tax for the taxable years ended September 30, 1956, and September 30, 1957, and for the taxable period October 1, 1957, to October 31, 1957, against North Hollywood Hospital, Inc., transferor, in the amount of $47,012.88, $80,709.33, and $3,878.02, respectively, and an addition to tax in the amount of $969.50 under section 6651(a) of the Internal Revenue Code of 1954 for the taxable period October 1, 1957, to October 31, 1957. This proceeding involves, in part, the liability of petitioner Paducah Co., Inc., as transferee of the aforementioned transferor corporation. [1] The Commissioner *76 also determined a deficiency in the income tax of petitioners Arthur M. Rosenthal and Fay G. Rosenthal for the taxable year 1957 in the amount of $6,433.37. Some of the issues raised by the pleadings have been settled by the parties. The remaining issues for decision are: (1) Did the transfer of certain property to North Hollywood Hospital, Inc., constitute in whole or in part a sale or a tax-free exchange under section 112(b)(5) of the Internal Revenue Code of 1939; (2) What was the basis of the property transferred to North Hollywood Hospital, Inc., for purposes of depreciation; (3) Did the notes, in whole or in part, given for the property transferred represent true indebtedness of North Hollywood Hospital, Inc.; and (4) Did the amounts received by petitioners Arthur M. and Fay G. Rosenthal from North Hollywood Hospital, Inc., represent in part the return of capital and in part interest, or were the payments in reality disguised dividends. Findings of *77 Fact Some of the facts have been stipulated and are so found, and the stipulation of facts, together with the exhibits attached thereto, is incorporated herein by this reference. Petitioner Paducah Co., Inc., is a corporation organized and existing under the laws of the State of California with its principal offices located in Culver City, California. Paducah Co., Inc., is liable as transferee for any income taxes due from North Hollywood Hospital, Inc. (hereinafter referred to as Corporation). Corporation was incorporated on November 9, 1953, under the laws of the State of Nevada and had its principal place of business in Los Angeles, California. Corporation kept its books of account and prepared its income tax returns on an accrual method. It filed its Federal income tax returns for the taxable years ended September 30, 1956 and 1957, and the period ended October 31, 1957, with the district director of internal revenue at Los Angeles, California. Petitioner Arthur M. Rosenthal (hereinafter referred to as Rosenthal) and Fay G. Rosenthal are individuals with their residence at 10450 Wilshire Boulevard, Los Angeles, California. At all times relevant hereto they were married, *78 accounted for their receipts and disbursements on the cash basis, and have regularly reported on their income tax returns their respective incomes and deductions on the same basis. Their return for the period here involved, the year ending December 31, 1957, was a joint return and was filed with the district director of internal revenue at Los Angeles, California. On or about October 25, 1949, Rosenthal acquired certain land located at what is now 12629 Riverside Drive, North Hollywood, California, at a cost of $18,777.12. On or about July 15, 1950, Rosenthal completed construction of a building designed as a general hospital known as the North Hollywood Convalescent Home at 12629 Riverside Drive, at a cost of approximately $62,291.68. On or about November 15, 1960, Rosenthal sold an undivided 50 percent interest in the land and building to Maurice Davidson (hereinafter referred to as Davidson) for $76,571.76. In late 1950 the name of the building was changed to the North Hollywood Hospital and Sanitarium. At the same time North Hollywood Hospital and Sanitarium, Inc., a California corporation (hereinafter referred to as the General Hospital), was formed to operate the hospital *79 and sanitarium. One hundred shares of stock at $100 per share were issued equally to Rosenthal and Davidson. In late 1950 and in 1951, Rosenthal and Davidson expended $31,174.62 for equipment in the North Hollywood Hospital and Sanitarium and $6,500 for certain land at 12619 Riverside Drive. In 1951 and 1952, Rosenthal and Davidson expended $32,179.84 on additions to the building at 12629 Riverside Drive. The land at 12619 Riverside Drive and the land, buildings, and equipment at 12629 Riverside Drive are hereinafter referred to as the general hospital property. In 1952 Rosenthal acquired adjacent land at what is now 12655 Riverside Drive at a cost of $22,255.84. In 1952 a maternity hospital was constructed on said land at a cost of $95,981.71. The land and buildings of the maternity hospital are hereinafter referred to as the maternity hospital property. The general and maternity hospital buildings were concrete block buildings. On or about August 1, 1953, Rosenthal transferred the following undivided interests in the maternity hospital property to the following persons at the prices indicated: Percentage
of Interest
Purchase
Name
Acquired
Price
Smiley Wecker
15
$25,753.61
Max Grossman
17 1/2
29,607.83
Maurice Young
17 1/2
22,107.83
*80 Said sales were made pursuant to options granted in late 1952. In about December 1952, North Hollywood Maternity Hospital, a California corporation (hereinafter referred to as the Maternity Hospital), was formed to operate the maternity hospital. Two hundred and fifty shares of stock were issued for $100 per share, as follows: Shares
Name
of Stock
Arthur M. Rosenthal
125
Smiley Wecker
65
Maurice Young
30
Max Grossman
30
Total
250
Rosenthal was experienced in the construction of hospital buildings. He acted as the general contractor and purchased the materials necessary to construct the general and maternity hospital buildings. The general hospital property was leased to the General Hospital for $5,000 per month plus the payment of the cost of insurance, taxes, and repairs. The maternity hospital property was leased to Maternity Hospital for $2,500 plus the payment of the cost of insurance, taxes, and repairs. In about August 1953, Maternity Hospital issued for $100 per share 40 shares to William Behrns, the pharmacist at the general hospital and 50 shares to Joseph Posell, who operated the laboratory at the maternity hospital. Pursuant *81 to escrow instructions dated August 13, 1953, on or about October 6, 1953, Phillip Rappaport, [2] on his own behalf as to 80 percent and on behalf of Marvin Rappaport as to 10 percent and Dov Rappaport as to 10 percent, acquired (1) the undivided one-half interest of Davidson in the general hospital property for $194,108, including approximately $12,500 allocable to equipment, and (2) Davidson's 50 shares of stock in General Hospital for $45,000. There is no relationship by blood or marriage between Davidson and Phillip Rappaport. Davidson sold his interest in the general hospital property and the stock of General Hospital because of important policy differences with Rosenthal regarding the conduct and expansion of General Hospital, and the deterioration of their personal relationship. Davidson was also convinced that the offer to purchase his interest in the general hospital property as well as his stock in General Hospital was reasonable. On or about December 4, 1953, Phillip Rappaport on his own behalf as to 80 percent and on behalf of Marvin Rappaport as to 10 percent and Dov Rappaport as to 10 percent, *82 acquired from Rosenthal an undivided 25 percent interest in the maternity hospital property at a cost of $47,514.14. Phillip Rappaport was not in any way related to Rosenthal. On October 7, 1953, David Rosenbloom (hereinafter referred to as Rosenbloom) acquired from Phillip Rappaport an undivided 20 percent interest in the general hospital property for $77,643.20 and 20 shares of the stock in General Hospital for $18,000. On December 5, 1953, Rosenbloom acquired from Phillip Rappaport an undivided 10 percent interest in the maternity hospital property for $19,005.66. On October 30, 1953, an "AGREEMENT TO ORGANIZE CORPORATION, AND FOR SALE OF REAL AND PERSONAL PROPERTY, AND SUBSCRIPTION AGREEMENT" was executed. All of the owners of the realty, equipment, and stock of General Hospital and Maternity Hospital signed the agreement with the exception of Rosenbloom and Rappaport's two sons, Marvin and Dov, who had each received a 5 percent interest in the General Hospital stock and property from their father. Rappaport had authority to act and did act on behalf of Marvin and Dov Rappaport and David Rosenbloom in signing the agreement. The agreement provided that Corporation would (1) *83 acquire the stock of General Hospital and Maternity Hospital in exchange for its stock; (2) purchase the general hospital property from the individual owners for a gross price of $553,500, of which $500,000 would be paid by a promissory note; and (3) purchase the maternity hospital property from the individual owners for a gross price of $311,100, of which $250,000 would be paid by a promissory note. Corporations are generally used to operate hospitals because there is no assurance that malpractice insurance will be sufficient to protect individuals against personal liability. On or about December 1, 1953, Corporation acquired all of the assets and business, and assumed all of the liabilities, of Maternity Hospital and General Hospital. As consideration therefor, Corporation issued 191 shares of its Class A common stock and 191 shares of its Class B common stock on account of the transfer by Maternity Hospital and 472 shares of its Class A common stock and 472 shares of its Class B common stock on account of the transfer by General Hospital. Said shares were issued either directly to the shareholders of said corporations or were issued to the said corporations and then distributed *84 to their shareholders in liquidation. The balance sheet of Corporation on December 1, 1953, was as follows: ASSETS
Cash
$14,654.63
Accounts Receivable
$37,341.95
Less: Provision for uncollectible
2,145.72
35,196.23
accounts
Inventory
15,504.23
Prepaid insurance, taxes and licenses
3,808.92
Deposits posted
180.00
Organization expense
900.00
Furniture and fixtures
14,695.98
Equipment, instruments and leasehold
30,490.30
improvements
Accrued professional fees
184.15
$115,614.44
LIABILITIES AND CAPITAL
Advance deposits
$ 2,761.00
Accounts payable
21,924.83
Note payable - Bank of America
2,500.00
Accrued salaries
1,566.01
Accrued supervision fees
15,000.00
Taxes payable
14,548.94
Accrued compensation insurance
689.07
Accrued professional fees
3,868.47
Accrued rent
5,850.00
Total Liabilities
68,708.32
Capital stock
46,906.12
TOTAL
$115,614.44
On March 1, 1954, the maternity hospital property was transferred to Corporation by grant deed, subject to the existing first trust deed in favor of Glendale Federal Savings & Loan Association. The principal *85 balance due on the note secured by said first trust deed on March 1, 1954, was $60,627.62. Said first trust deed note was payable and was paid at all times here relevant at the rate of $1,023 per month. In payment of the remainder, Corporation executed and delivered a note secured by a deed of trust and a chattel mortgage on the maternity hospital equipment. Said note was in the amount of $250,000 and was amortizable over a period of approximately 12 years. The said note, deed of trust, and chattel mortgage were in a conventional commercial form. The note was treated as a secured indebtedness of Corporation on its books of account and on its financial statements. The provisions of the note included: Interest at the rate of 5 1/2 percent per annum; payment of principal and interest monthly at the rate of $2,000 for 24 months, then $2,500 per month until the note was paid off; default clause and chattel mortgage, as well as a deed of trust. The aggregate adjusted basis as of March 1, 1954, of the maternity hospital property of all the persons who transferred maternity hospital property was $151,693, consisting of $29,640 allocable to land and $122,053 allocable to buildings. The *86 value of this land did not change during the period from August 1953 to March 1954. On April 30, 1954, the general hospital property was transferred by grant deed to Corporation, subject to the existing first trust deed in favor of Surety Bond Savings and Loan Association. The principal balance due on the note secured by said first trust deed on April 30, 1954, was $49,846.22. Said first trust deed note was payable and was paid at all times here relevant at the rate of $700 per month. In payment of the remainder, Corporation executed and delivered a note secured by a deed of trust and a chattel mortgage on the general hospital equipment. Said note was in the amount of $500,000 and was amortizable over a period of approximately 9 years. The said note, deed of trust, and chattel mortgage were in a conventional commercial form. The note was treated as a secured indebtedness of Corporation on its books of account and on its financial statements. The provisions of this note were similar in all respects to the note given for the maternity hospital property except as to the total amount and the total monthly payment. The aggregate adjusted basis as of April 30, 1954, of the general *87 hospital property of all the persons who transferred the general hospital property was $249,828, including $44,413 allocable to land and $182,879 allocable to buildings. The value of this land did not change during the period from October 1953 to April 1954. One purpose for consummating the above transactions was to permit the construction of a wing to connect the theretofore separate general and maternity hospitals, in order to integrate the maternity hospital in the general hospital and to enable the addition of new facilities, such as wards, which were necessary for a modern hospital. The aforestated transactions were consummated pursuant to the agreement of the parties concerned and were all part of a common plan. At the time the said $250,000 and $500,000 notes (hereinafter referred to as the notes) were executed and delivered, the holders thereof expected to receive, and the officers of the Corporation intended to make, payment in accordance with the terms of the notes. There was no understanding that the payments were contingent on earnings of Corporation or that they were subordinated to the claims of other creditors. The transactions in which the general and maternity *88 hospital properties were conveyed to Corporation were treated as sales on the income tax returns of Corporation and the owners of the properties. At all times relevant herein, Corporation had outstanding 663 shares of Class A common stock and 663 shares of Class B common stock. Voting power was vested exclusively in the Class A common stock. In all other respects, there was no distinction between the Class A and Class B common stock. The ownership of the Class A and Class B common stock of Corporation at all times prior to January 1955 was as follows: No. of
No. of
Shares
Shares
Class A
Class B
Common
Common
Shareholder
Stock
Stock
Arthur M. Rosenthal
306
306
Phillip Rappaport
94.4
94.4
Marvin Rappaport
23.6
23.6
Dov Rappaport
23.6
23.6
David Rosenbloom
94.4
94.4
Smiley Wecker
37
37
Maurice Young
17
17
Max Grossman
17
17
Joseph Posell
28
28
William Behrns
22
22
663
663
The ownership of the maternity hospital and the general hospital properties, respectively, on March 1, 1954, and April 30, 1954, and the percentage of ownership of Corporation's stock at all times prior to January 1955, were as follows: *89 Maternity
General
hosp. prop.
hosp. prop.
Outstand-
until convey-
until convey-
ing stock
ance on 3/1/54
ance on 4/30/54
prior to 1/55
Name
(Percent)
(Percent)
(Percent)
Arthur M. Rosenthal
25
50
46.1538
Phillip Rappaport
10
20
14.2383
David Rosenbloom
10
20
14.2383
Marvin Rappaport
2.5
5
3.5596
Dov Rappaport
2.5
5
3.5596
Smiley Wecker
15
5.5807
Maurice Young
17.5
2.5641
Max Grossman
17.5
2.5641
Joseph Posell
4.2232
William Behrns
3.3183
Total
100.0
100
100.0
Corporation paid $5,000 per month rent for the general hospital property from December 1953 through April 1954, inclusive, and $2,500 per month rent for the maternity hospital property from December 1953 through February 1954, inclusive. In addition, Corporation insured the properties, paid all taxes and assessments thereon, and was responsible for maintaining the property. No complaints regarding the rent paid by Corporation were made by any of the shareholders of Corporation. Payments of principal and interest were made by Corporation on the notes, as follows: $500,000 General
$250,000 Maternity
Hospital Note
Hospital Note
Payment
Payment
Payment
Payment
Due
Made
Due
Made
1954
Mar.
$ 2,000
$ 1,600
Apr.
2,000
1,600
May
$ 5,000
$ 4,000
2,000
1,600
June
5,000
5,000
2,000
2,000
July
5,000
5,000
2,000
2,000
Aug.
5,000
5,000
2,000
2,000
Sept.
5,000
5,000
2,000
2,000
Oct.
5,000
5,000
2,000
2,000
Nov.
5,000
5,000
2,000
2,000
Dec.
5,000
5,000
2,000
2,000
1955
Jan.
5,000
5,000
2,000
2,000
Feb.
5,000
5,000
2,000
2,000
Mar.
5,000
2,169.66
2,000
1,097.80
Apr.
5,000
5,000
2,000
2,000
May
5,000
2,135.74
2,000
1,088.72
June
5,000
5,000
2,000
2,000
July
5,000
5,000
2,000
2,000
Aug.
5,000
2,000
Sept.
5,000
2,000
Oct.
5,000
2,000
Nov.
5,000
2,000
Dec.
5,000
2,500
2,000
1,000
1956
Jan.
5,000
2,500
2,000
1,000
Feb.
5,000
2,500
2,000
1,000
Mar.
5,000
2,500
2,500
1,000
Apr.
5,000
2,500
2,500
1,000
May
6,000
2,500
2,500
1,250
June
6,000
3,000
2,500
1,250
July
6,000
3,600
2,500
1,500
Aug.
6,000
3,600
2,500
1,500
Sept.
6,000
3,600
2,500
1,500
Oct.
6,000
3,600
2,500
1,500
Nov.
6,000
3,600
2,500
1,500
Dec.
6,000
3,600
2,500
1,500
1957
Jan.
6,000
4,200
2,500
1,750
Feb.
6,000
4,200
2,500
1,750
Mar.
6,000
4,200
2,500
1,750
Apr.
6,000
4,200
2,500
1,750
May
6,000
4,200
2,500
1,750
Accrued Interest 5/28/57
5,295.31
3,130.59
Make-Up Principal Payment 6/30/57
18,000
7,500
June
6,000
4,200
2,500
1,750
July
6,000
5,000
2,500
2,000
Aug.
6,000
5,000
2,500
2,000
Sept.
6,000
5,000
2,500
2,000
$222,000
$171,400.71
$95,500
$74,617.11
*90 Corporation made no payments or only partial payments on the notes commencing in March 1955 because of financial difficulties which were not anticipated when the notes were issued. These difficulties were attributable to the loss of patients resulting from the departure from the hospital of approximately 40 staff physicians upon the opening of the West Valley Hospital in February 1955. Prior to the opening of the West Valley Hospital, all creditors of Corporation were paid promptly. In late 1956, Phillip Rappaport, representing himself and his sons, instructed his attorney to institute proceedings against Corporation to foreclose on the security of the notes because of the continued failure of Corporation to make the required payments. No legal action, however, was ever instituted. In May 1957 shareholders of Corporation and Paducah Co., Inc., began negotiations for the sale of all of the stock of Corporation. On September 20, 1957, Paducah Co., Inc., paid $640,000 to the then shareholders of Corporation for all of its stock. It was in view of these negotiations and subsequent sale that legal proceedings were never instituted against Corporation. It is not uncommon for corporations *91 which operate hospitals to rent the real property in which they operate. The taxable income of Corporation for the period December 1, 1953, to February 28, 1954, was $7,644.20. The balance sheet of Corporation as of September 30, 1954, December 31, 1954, September 30, 1955, and June 30, 1957, was as follows.. 9/30/54
12/31/54
9/30/55
6/30/57
ASSETS
CURRENT ASSETS: Cash
$ 24,009
$ 31,196
$ 12,282
$ 88,313
Accounts Receivable
(Less allowance)
39,074
42,723
58,978
93,793
Inventories
18,048
19,679
19,973
16,619
Prepaid Expenses
6,833
8,665
10,934
3,448
TOTAL CURRENT ASSETS
87,964
102,263
102,167
202,173
Depreciated Value of Land,
Buildings and Equipment
941,876
926,650
905,116
798,195
Other Assets
900
900
2,166
19,940
$1,030,740
$1,029,813
$1,009,449
$1,020,308
LIABILITIES
CURRENT LIABILITIES: Accounts Payable - Trade
28,671
20,607
24,593
24,998
Notes, Taxes, Expenses, etc.
74,452
60,048
165,932
125,008
TOTAL CURRENT LIABILITIES
103,123
80,655
190,525
150,006
LONG-TERM DEBTS
865,881
871,533
747,195
726,012
CAPITAL STOCK
46,906
46,906
46,906
46,906
SURPLUS
14,830
30,719
24,823
97,384
TOTAL LIABILITIES
$1,030,740
$1,029,813
$1,009,449
$1,020,308
*92 The ratio of debt to equity according to the balance sheet of Corporation as of September 30, 1954, was approximately 14 to 1. Corporation borrowed on its unsecured promissory notes as follows: Percent
Interest
Per
Date
Amount
Lender
Annum
4/30/54
$ 5,000
Harry Rothblatt
7
4/30/54
5,000
Jeanette Grodman
6
4/30/54
5,000
Smiley Wecker
6
4/30/54
10,000
Ida Blum
6
7/ 1/54
12,000
Bank of America
5 1/2
7/ 1/54
5,000
Jeanette Grodman
6
7/ 1/54
5,000
Ida Graver
7 All of these borrowings were due on April 30, 1959, except for the loan from the Bank of America which was payable on December 27, 1954. Corporation made said borrowings for the purpose of constructing the wing to connect the two hospitals. The sum of $49,228.12 was expended in connection with the construction of the wing which permitted the addition of approximately 32 additional beds. The construction was completed between May 1, 1954, and September 30, 1954. As a result of the construction, the combined hospital became a 99-bed hospital. No formal dividends were ever declared or paid by Corporation. Respondent has determined that the *93 general hospital and maternity hospital properties were transferred to Corporation in a tax-free exchange under the provisions of section 112(b)(5), Internal Revenue Code of 1939. Accordingly, he has disallowed depreciation to Corporation which is in excess of the adjusted basis of the properties in the hands of the individual owners. He has further disallowed any interest deductions to Corporation and has treated the payments received by Rosenthal as dividend income. Ultimate Findings of Fact The transfer of the general hospital and maternity hospital properties to Corporation constitutes a sale, for tax purposes, to the extent of the fair market value of the property transferred at the time of the sale. The fair market values of the land, buildings, and equipment comprising the general hospital property and the land and buildings comprising the maternity hospital property at the respective dates of transfer to Corporation were as follows: General
Maternity
Hospital
Hospital
Property
Property
Land
$ 44,500
$ 30,000
Buildings
303,000
178,000
Equipment
53,000
Total
$400,500
$208,000
Opinion Petitioners *94 contend that the general hospital and maternity hospital properties were sold to Corporation in an arm's length transaction for the then present fair market value of the properties. Therefore, petitioners argue that Corporation is entitled to depreciate the properties at their cost (sales price) and is also entitled to deduct the interest payments made on the two notes which were given in payment for the properties. The individual petitioners contend that the payments received from Corporation represent in part capital gain and in part interest income and that no part represents disguised dividends. Respondent, on the other hand, maintains that the creation of Corporation, the acquiring by Corporation of the assets of General Hospital and Maternity Hospital, and the transfer of the properties to it were all part of a tax-free exchange controlled by section 112(b)(5) [3] of the Internal Revenue Code of 1939. Accordingly, respondent has limited Corporation to a depreciation allowance equal to the adjusted basis of the properties in the hands of the individuals and has denied Corporation an interest deduction on the notes. Consistent with this treatment, respondent has treated the payments *95 received by the individual petitioners as disguised dividends. In the alternative, respondent argues that if this Court finds that section 112(b)(5) is not applicable and that a sale did take place, then the basis for depreciation and interest deductions to Corporation should be the fair market values of the properties at the time of the transfers. It is then argued by respondent that the fair market values of the properties were much less than the stated sales prices. *96 While we agree with petitioners, that a sale did take place, we are also in agreement with respondent that the "sales price" was in excess of the fair market value of the properties. The first question we have to decide here is whether or not the hospital properties were in fact sold to Corporation. This is primarily a question of fact which must be decided after giving full consideration to all the facts and circumstances surrounding the transaction. Gooding Amusement Co. v. Commissioner, 236 F. 2d 159 (C.A. 6, 1956), affirming 23 T.C. 408 (1954), certiorari denied 352 U.S. 1031 (1957). "Precedents provide no ready answer, for the question is factual and no single factor may be said to be controlling." Emanual N. (Manny) Kolkey, 27 T.C. 37, 59 (1956), affd. 254 F. 2d 51 (C.A. 7, 1958). We hold that the properties were actually sold and not exchanged in a transaction governed by section 112(b)(5). Corporation was organized in November 1953. In exchange for its stock it acquired all the assets of General Hospital and Maternity Hospital. Its balance sheet as of December 1, 1953, shows a capital contribution of $46,906.12. *97 This figure represents a substantial capital contribution. Charles E. Curry, 43 T.C. 667, 692 (1965); Ainslie Perrault, 25 T.C. 439, 450 (1955), affd. per curiam 244 F. 2d 408 (C.A. 10, 1957). The hospital properties were not owned by General Hospital or Maternity Hospital but were rented from the individual owners. In fact, for a short period of time Corporation rented the properties and during that time was able to make a profit from its operations. Accordingly, it is obvious that Corporation could have successfully operated as a hospital without itself owning the properties. Therefore, this is not a case where the property transferred to a controlled corporation was absolutely necessary for its conduct of a business. Warren H. Brown, 27 T.C. 27, 34 (1956). Corporation gave, as payment, its notes to the sellers of the properties. The notes bore interest and were secured by deeds of trust. In addition, the notes given for the general hospital and maternity hospital properties were secured by chattel mortgages on the equipment of both corporations. The interest and principal payments were fixed in the notes and payment was not *98 conditional upon the earnings of Corporation. Nor were the note holders' rights subordinated to claims of other creditors of Corporation. Substantial payments of interest and principal were made by Corporation. Respondent points to the fact that over the years Corporation fell somewhat in arrears on its obligations. While this is true, the reason for the partial default was due to the unforeseen difficulties arising subsequent to the sale via the leaving of 40 doctors from the staff of Corporation and the opening of another hospital nearby. For this reason, we do not believe that the partial default in payment is a significant factor in this case. Cf. Charles E. Curry, supra, at 691. Respondent also points to the high ratio of debt to equity as evidence that a sale did not, in substance, occur. While it is true that a ratio of debt to equity of 14 to 1 is higher than normal, it is not unusual. See Charles E. Curry, supra, at 691; J. I. Morgan, Inc., 30 T.C. 881, 891 (1958), reversed on another issue *99 272 F. 2d 936 (C.A. 9, 1959); Sun Properties v. United States, 220 F. 2d 171 (C.A. 5, 1955). In this case, where there has been a substantial capital contribution and where property ownership is not essential and not necessarily placed at the risk of the business, we hold that the debt to equity ratio is not a significant factor. Charles E. Curry, supra.
Respondent also attacks the substance of the transactions because it lacks a business purpose and was motivated solely by tax considerations. We disagree. Petitioners have demonstrated that the transfer of the properties was made in order to put the ownership of the properties in the hands of one entity so that the necessary improvements - the building of a connecting wing and enlarging of both hospitals - could be accomplished. Respondent places strong reliance on the lack of arm's length dealing to indicate that a sale did not occur. Respondent points to the fact that the two pieces of property here involved were transferred at prices well in excess of their then fair market values. While we agree and have found as a fact that the fair market values of the properties were less than the *100 stated sales prices, we do not feel this factor destroys the sale in its entirety. When a purchaser pays more for property than its present worth, the excess may represent something other than the sales price; but it does not necessarily mean that the transaction is not a sale. We have found that the fair market value of the general hospital property was $400,500 at the crucial date, while the fair market value of the maternity hospital property was $208,000. Both petitioners and respondent had expert testimony regarding the value of the properties in question. While we feel respondent's expert, who took into consideration sales to unrelated parties of the very same property in close proximity to the transfer date was basically correct in his valuations, we have increased his valuations to reflect what we believe were the values of the land on which the properties were situated. Petitioner did not offer any evidence regarding the value of the land in question. However, since the record reveals that land values did not decrease during the crucial time, we believe and have found that the values of the land were at least equal to their basis in the hands of the individual owners. *101 We do not think our recent decision in Burr Oaks Corporation, 43 T.C. 635 (1965), (on appeal C.A. 7, July 30, 1965), relied on by respondent, requires a contrary result here. In finding that the transaction therein was not a sale but really an equity contribution, we relied upon these points: (1) The corporation was not only undercapitalized but had no significant capital ($4,500); (2) the land transferred was the corporation's only asset of significance and without it the corporation could not engage in business; (3) payment was dependent solely upon the success of a new, untried business which was undercapitalized; and (4) payment could be made only from the proceeds received from the sale, in lots, of the property transferred. A comparison of these points with the facts of the instant case clearly indicates none are here present. Therefore, we are of the opinion that Burr Oaks Corporation, supra, is clearly distinguishable from the instant case. Accordingly, we hold that to the extent of the fair market value of the properties, a sale took place and the notes given in payment created a valid debtor-creditor relationship to that extent. *102 Having found that the transfer of the properties to Corporation was a valid sale for tax purposes to the extent of the fair market value of the properties, there remains the question of how the excess price should be considered for tax purposes. [4] We are convinced that the excess price charged Corporation by its controlling stockholders should be treated as a disguised dividend to the extent of Corporation's earnings and profits. Goldstein v. Commissioner, 298 F. 2d 562 (C.A. 9, 1962), affirming a Memorandum Opinion of this Court. Accordingly, we hold that Corporation is entitled to depreciation on the buildings and equipment and is also allowed an interest deduction consistent with the findings herein. The portion of interest and depreciation deductions to be disallowed Corporation and the amount received by the individual petitioners to be treated as a dividend will be reflected in the Rule 50 computations. Decisions will be entered under Rule 50. Footnotes
1. Petitioner Paducah Co., Inc., has conceded that if it is determined that the transferor corporation is liable for the deficiencies in income tax Paducah Co., Inc., is liable as transferee.↩
2. Phillip Rappaport is the father of Marvin Rappaport and Dov Rappaport.↩
3. SEC. 112. RECOGNITION OF GAIN OR LOSS. (b) Exchanges Solely in Kind. - * * *
(5) Transfer to corporation controlled by transferor. - No gain or loss shall be recognized if property is transferred to a corporation by one or more persons solely in exchange for stock or securities in such corporation, and immediately after the exchange such person or persons are in control of the corporation; but in the case of an exchange by two or more persons this paragraph shall apply only if the amount of the stock and securities received by each is substantially in proportion to his interest in the property prior to the exchange. Where the transferee assumes a liability of a transferor, or where the property of a transferor is transferred subject to a liability, then for the purpose only of determining whether the amount of stock or securities received by each of the transferors is in the proportion required by this paragraph, the amount of such liability (if under subsection (k) it is not to be considered as "other property or money") shall be considered as stock or securities received by such transferor. * * *↩
4. Having found that the transfer of the properties was a sale, it follows that section 112(b)(5) does not apply. See Charles E. Curry, 43 T.C. 667, 696↩ (1965), and cases cited therein.