CHESTER I. JOHNSON AND MARY ELLEN JOHNSON, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Johnson v. Commissioner
Docket Nos. 5904-75, 5905-75, 5906-75.
United States Tax Court
T.C. Memo 1977-436; 1977 Tax Ct. Memo LEXIS 10; 36 T.C.M. (CCH) 1780; T.C.M. (RIA) 770436; December 27, 1977, Filed *10 Hubbard owned 70.23 percent of the stock of Lumber Co. and Johnson owned the other 29.77 percent. Hubbard and Johnson each owned 24.5 percent of the stock of Fireless Products Co. and the remaining 51 percent was owned by Basic, an unrelated third party. Under agreements negotiated between Hubbard, Basic, and others for the manufacture and sale of fireproof roofing shingles, using Fireless as the principal, Lumber Co. agreed to advance working capital to Fireless as needed. Held, the advances made by Lumber Co. to Fireless prior to Jan. 1, 1972, were intended to be and were in fact loans and Lumber Co. is entitled a bad debt deduction with respect thereto in 1972. Advances made after that date were in the nature of contributions to capital and are not deductible as bad debts. Held,further, Hubbard and Johnson did not receive constructive dividends from Lumber Co. in 1971 and 1972 in the amounts of Lumber Co.'s advances to Fireless. Clarence J. Ferrari, for the petitioners. Benjamin C. Sanchez, for the respondent. DRENNEN
MEMORANDUM FINDINGS OF FACT AND OPINION DRENNEN, Judge: In these consolidated cases respondent determined deficiencies in petitioners' Federal income taxes *11 as follows: Docket No.
Petitioner
Year
Deficiency
5904-75
Chester I. Johnson and
1971
$56,550
Mary Ellen Johnson
1972
63,790
5905-75
Hubbard & Johnson Lumber
Co.
1972
204,433
5906-75
Wesley L. Hubbard and
1971
62,134
Beatrice Hubbard
1972
66,005 The issues presented for our decision are: [2] *12 (1) Whether under section 166(a), I.R.C. 1954, [3] advances made by petitioner Hubbard and Johnson Lumber Co. to Fireless Products Co. actually were debt or were equity investments as determined by respondent. (2) Whether under sections 301 and 316 the advances were constructive dividends to petitioners Chester I. Johnson and Wesley L. Hubbard who were shareholders of both Hubbard & Johnson Lumber Co. and Fireless Products Co. FINDINGS OF FACT Some facts have been stipulated and are so found. Petitioner Hubbard & Johnson Lumber Co. (Lumber Co.), incorporated in 1948 and liquidated in 1973, was a California corporation. It filed its Federal income tax return for 1972 with the Internal Revenue Service at Fresno, Calif. Petitioner's principal office was at Redwood City, Calif., at the time its petition was filed. Petitioners Wesley L. and Beatrice Hubbard are married individuals who filed a joint return for 1971 and 1972 with the Internal Revenue Service at Fresno, Calif. They resided in Palo Alto, Calif., at the time their petition was filed. Petitioners Chester I. and Mary Ellen Johnson are married individuals who filed a joint return for 1971 and 1972 with the Internal *13 Revenue Service at Fresno, Calif. They resided in Los Gatos, Calif., at the time their petition was filed. Beatrice Hubbard and Mary Ellen Johnson did not actively participate in the transactions in question, and the designations "Hubbard" and "Johnson" will refer to Wesley L. Hubbard and Chester I. Johnson, respectively. The capital stock of Lumber Co. was owned 70.23 percent by Hubbard and 29.77 percent by Johnson. Lumber Co. was in the wholesale and retail lumber and building supply business. Between 1948 and 1965 Henry C. Thompson developed a manufacturing process for fireproof synthetic materials. In 1965 Thompson organized Thompson Chemicals, Inc. (Thompson Chemicals), to continue development of the materials. In November 1967 Thompson Chemicals granted a license to S-T Development Corp. to develop fireproof synthetic roofing products. In January 1968 S-T Development Corp. granted a northern California franchise to H & J Roofing Products Co. (H & J Roofing) to develop a manufacturing process for fireproof synthetic roofing products. H & J Roofing was incorporated in February 1968 by Hubbard, Johnson, Kneeland Stone, and Charles Williams, each contributing $12,500 for *14 25 percent of the corporation's stock. The corporation elected to be taxed under subchapter S. H & J Roofing in turn entered into an agreement with GZ Products, Inc. (GZ), for the manufacture of the roofing product. H & J Roofing continued to be obligated under this agreement until March 11, 1970. Hubbard and Johnson formed a partnership known as Hubbjohn in early 1968 to make and hold investments. The partnership was owned 50 percent by Hubbard and 50 percent by Johnson.
In August 1968 Hubbjohn, Inc., was incorporated and the Hubbjohn partnership business was transferred to Hubbjohn, Inc. The corporation's stock was owned 50 percent by Hubbard and 50 percent by Johnson. The primary purpose of Hubbjohn, Inc., was to own, when possible, investments of Hubbard and Johnson, including investments in joint ventures with framing contractors to frame various commercial and residential structures. Hubbjohn, Inc., also elected to be taxed under subchapter S. By the fall of 1969 H & J Roofing was experiencing difficulties. Among other problems, both Stone and Williams became insolvent, and their stock in H & J Roofing was put into the hands of a trustee for the benefit of their creditors. *15 Finally, sometime between late 1969 and early 1970, H & J Roofing terminated its synthetic roofing product business. Hubbard and Johnson caused Fireless Products Co. (Fireless) to be incorporated in February 1970 to manufacture and market the same fireporoof synthetic product that had been marketed by H & J Roofing. Hubbard and Johnson each contributed $10,000 for one-half of the corporation's common stock. Originally, it was anticipated that Fireless would elect subchapter S status, but no election was made. Fireless entered into an agreement with GZ dated March 11, 1970, under which GZ was to manufacture roofing products for Fireless using the Thompson Chemicals process. Pursuant to the agreement GZ was to design and own a plant for the manufacture of the roofing products at GZ's present location in Sacramento, Calif., and to purchase for the account of Fireless all necessary plant machinery and equipment for the manufacturing facility. [4] Fireless agreed to contribute up to $164,500 for the purchase of machinery and equipment and the cost of installing same. GZ was then to manufacture the roofing product for Fireless at a fixed price per unit, Fireless to pay for all direct *16 labor materials and other production costs, with GZ providing the front office overhead or management and technical services. GZ agreed to produce specified squares of the roofing product per day according to specifications. The agreement between GZ and H & J Roofing was cancelled, and Lumber Co. guaranteed the obligations of Fireless to GZ under the agreement. However, by virtue of an amendment also dated March 11, 1970, Hubbard and Johnson individually were substituted for Lumber Co. as the guarantors of Fireless' obligations to GZ. From February 11, 1970, through November 30, 1970, either Hubbjohn, Inc., or Hubbard and Johnson loaned an aggregate of $198,820 to Fireless primarily for the purchase of manufacturing equipment, which loans were repaid prior to January 31, 1971. In April 1970 Hubbjohn, Inc., acquired the controlling interest in Thompson Chemicals, Inc. As of June 26, 1970, negotiations had begun between Fireless (with Hubbard as its representative), Thompson Chemicals, and Basic, Inc. (Basic), an Ohio corporation, with respect to a possible business *17 association. Basic is a large publicly held company engaged in the manufacture and sale of chemical products. It was the principal supplier in the United States of magnesium oxide, the chemical that constituted the primary raw material used in making the Thompson-Fireless roofing product, and it had employees with the expertise to assist Fireless in using the chemical materials in the manufacturing process. As part of the negotiations, a "Report on Fireproof Synthetic Roofing Shake" prepared by Thompson Chemicals was delivered to Basic. The report included the following comments regarding capitalization of Fireless: From the inception of the roofing product to the date of organization of Fireless Products Company, over $500,000 had been invested in the project. This is represented mainly by accrued losses of S-T Development Company, Norgan Products Company, [5]H & J Roofing Products Company, and Thompson Chemicals, Inc. Some of this cost could be attributed to research and developemnt expense, and some to false starts. As pointed out above, the difficulties of the predecessor companies stemmed from undercapitalization and lack of adequate quality control. While there is little *18 tangible to show for this investment, there has been amassed a valuable store of technology on quality control, methods of manufacture, costs, marketing and the like. The present program is a fresh approach, the first fully planned program and the first fully protected by adequate safeguards. The San Jose plant is essentially complete, financed internally, and all machinery paid for. At July 1, 1970, a pro forma balance sheet would appear approximately as follows: Assets *
Liabilities
Inventory
$19,000
Notes due
Other current assets
2,000
shareholders **
$34,000
Machinery and leasehold
Common stock
20,000
improvements
20,000
Earned surplus
Office equipment
1,000
(deficit) ***
12,000
$42,000
$42,000
The construction of the Sacramento plant will require infusion of additional capital. The total cost of the plant installation *19 (machinery, labor and leasehold improvements) will be approximately $185,000. Some savings will be made on specific items, but it is felt a conservative approach requires an estimate of total plant investment at $200,000. Additional capital will be needed for working capital to provide cash flow and to finance modest amounts of raw material and finished goods inventory. The amount is estimated at $100,000. This may seem modest, but after considerable study it appears that (with terms of net 30 days on all materials), once production is under way, not more than two weeks' production ($42,900 of raw materials at 300 squares per day) will have to be financed. It is proposed to raise this additional capital of $300,000 by a long term loan or by sale of an equity interest in the business. A pro forma statement for Sacramento would thus appear: Assets
Liabilities
Inventory
$ 50,000
Long term debt
$300,000
Other current assets
50,000
Plant and equipment
200,000
$300,000
$300,000 or, combined with the San Jose operation, would appear: Assets
Liabilities
Inventory
$ 69,000
Shareholders' equity
$ 20,000
Other current assets
52,000
Long term debt
300,000
Plant, machinery and
Notes due
leasehold
shareholders
34,000
improvements
220,000
Earned surplus
12,000 (deficit)
Office equipment
1,000
$342,000
$342,000
This *20 report also analyzed income and costs of the project and had attached a net profit analysis which projected net profits for Fireless, after taxes, of between $242,000 and $693,000 (rounded) per year. Negotiations between representatives of Basic, Fireless, and Thompson Chemicals continued for several months during which time Basic made a thorough investigation of the proposed business of Fireless. It was interested in assurance that the process being used by Fireless was fully protected by the Thompson Chemicals patent, that the chemical composition of the product was sound, that there would be an adequate facility for manufacturing the product, that the product would be properly marketed, and that the enterprise would be financially stable. As a result of the investigation and negotiations, during which it became apparent that Fireless needed Basic more than Basic needed Fireless, Basic decided that a business association with Fireless would be beneficial to Basic because of the profit to be realized from its sales of raw materials and from the earnings of Fireless. Basic also decided that its association with Fireless should be in the form of a majority ownership interest. It *21 was also concluded that Lumber Co., because of its established position in the building materials business, would be the natural marketing agent of the roofing product. Hubbard and Johnson anticipated that Lumber Co. would realized at least $250,000 per year under a distributorship agreement. During the course of the negotiations the parties prepared and considered projections of the sales, costs, and profits that might be involved in the roofing product business conducted by Fireless. Based on the assumptions used, the projections prepared by Basic indicated that Fireless should have earnings of about $360,000 during its start-up year and about $850,000 per year when it reached normal production. Both Hubbard and Johnson and the representatives of Basic were very enthusiastic about the roofing product because it was a fireproof roofing shake or tile that was much lighter in weight than any other fireproof roofing tiles on the market at that time, and it also had other characteristics that gave it an advantage over the competing products. As a result of the negotiations the following agreements were reached on November 30, 1970: 1. Thompson Chemicals licensed Fireless to manufacture *22 and sell fireproof synthetic roofing products and other materials using Thompson Chemicals' invention and technical information in return for a royalty of 2 percent of sales. Royalties were to be paid until February 28, 1986. 2. Basic agreed to: (a) Purchase 51 percent of the Fireless stock held by Hubbard and Johnson for $10,200 (thereafter Hubbard and Johnson each owned 24.5 percent of the Fireless stock); (b) purchase up to $300,000 of machinery and equipment for use of Fireless in manufacturing the product (including machinery and equipment already owned by Fireless) and lease it to Fireless until February 28, 1986, in exchange for an annual rental of 1 percent of sales; (c) provide Fireless certain management services through a subsidiary of Basic; and (d) make advances to Fireless in the form of raw materials until the plant was operative and payments could be made from product sales. The sale-leaseback arrangement provided the means to repay the $198,820 in loans owed Hubbjohn or Hubbard and Johnson previously mentioned. 3. Fireless and Lumber Co. also executed a distributorship agreement under which Lumber Co. was granted the exclusive right to distribute the roofing *23 product throughout California with a discount or commission of 5 percent of sales. As part of the stated consideration for this distributorship, Lumber Co. paid Fireless $55,152.73. This amount equaled Fireless' prior net loss for the period April 1, 1970, to November 30, 1970; as a result of this income Fireless had zero net income for the 8-month period. Among other provisions, Lumber Co. (Hubbard in agreement) also agreed: Hubbard shall provide from time to time as reasonably required by Fireless sufficient working capital to permit Fireless to manufacture efficiently, and to supply promptly, Hubbard's orders for products and to enable Fireless to comply with its obligations under the agreement dated March 11, 1970 with G Z Products, Inc. For purposes of the foregoing Fireless shall not be required to withhold distribution of its earnings to its shareholders but shall be required to provide working capital therefrom for other corporate purposes (including for orders, if any, for products from parties other than Hubbard). The form in which Hubbard shall provide such working capital shall be in the sole and exclusive discretion of Hubbard, and may take such form as cash, lines *24 of credit, inventory financing devices (including the pledging of Fireless inventory) or the like; provided that Hubbard shall be solely responsible for payment of the cost of providing such working capital. The agreement did not provide for an independent evidence of indebtedness or security, for a fixed maturity date, or for interest. There was no explicit provision for repayment. The term of this agreement was to run from November 30, 1970, to December 31, 1972, and thereafter for successive annual terms subject to termination at the end of any term by either party. As a result of the various agreements, it was assumed that Fireless would not need much working capital. Thompson Chemicals would make its patented process available to Fireless. Basic would provide the machinery required to manufacture the product, the chemical technology, and would defer payment for the raw materials it supplied until the venture got under way. GZ would provide the manufacturing plant at Sacramento and would produce the product. Lumber Co. would market the product and provide working capital if needed. Payment for all of these arrangements except production costs was based on a percentage of *25 sales.
Because of unanticipated problems, Lumber Co. did advance to Fireless under the terms of the agreement amounts aggregating $222,597 in 1971 and $202,095 in 1972. These amounts were accounted for by Lumber Co. as accounts receivable and by Fireless as accounts payable. None of these amounts were repaid to Lumber Co. by Fireless. Manufacturing operations started at the GZ plant in Sacremento in May 1971 and continued through mid-1973. Throughout this period Saul Hoffman, an employee of Basic or its subsidiary, managed Fireless. Neither Hubbard nor Johnson was actively engaged in managing Fireless. The manufacturing process was unsuccessful because of unexpected problems in quality control and because GZ became insolvent and was unable to fulfill its obligations under the March 11, 1970, agreement. On its income tax returns for its fiscal years ending March 31, 1971 and 1972, Fireless reported operating losses of $59,744.11 and $203,245.43, respectively. It apparently ceased doing business sometime in 1973. [6] *26 Minutes of the board of directors' meetings pertinent to the advances of Lumber Co. to Fireless were as follows: At Lumber Co.'s meeting on February 9, 1971, its board authorized its president to make such advances as from time to time might be necessary as working capital under the Lumber Co.-Fireless November 30, 1970, agreement. At Fireless' October 25, 1971, meeting the first matter its board considered was the repayment of advances made by Lumber Co., which then were in excess of $170,000. The board confirmed the company's prior anticipation that such loans were needed only to finance receivables and that repayment would be made shortly. Thereafter, at Fireless' July 24, 1972, meeting, the board further ratified its obligation to repay any advances made by Lumber Co. Hubbard also stated his concern at this meeting that the amount of the advances far exceeded the parties' initial anticipation at the time of the November 30, 1970, agreement. After January 1973, Hubbard, Johnson, *27 and Basic made additional capital contributions to Fireless of cash aggregating approximately $50,000 in the same ratio as their stock ownership. These funds were used in an attempt to salvage the Fireless business forsale. Arthur Young & Co., certified public accountants, reviewed Lumber Co.'s financial statements for 1971 and 1972 and determined the accounting classification of the advances as current assets was proper. Profit projections for Fireless were more than adequate to support advances in the amounts originally contemplated by the parties. Lumber Co. wrote off on its books in 1972 the entire amount of its advances to Fireless and, in its 1972 income tax return, claimed a bad debt deduction of $424,692 for the amounts it had provided to Fireless during 1971 and 1972 in the respective amounts of $222,597 and $202,095. Respondent disallowed the bad debt deduction on the ground that the advances were equity investments. [7]
Respondent also determined that *28 for 1971 and 1972 Hubbard and Johnson each received constructive dividends from Lumber Co. as a result of funds Lumber Co. provided Fireless. According to respondent, Hubbard and Johnson each received constructive dividends of $108,500 in 1971 and $103,846 in 1972, resulting in income tax deficiencies of $62,134 and $66,005. OPINION Pursuant to section 166(a) Lumber Co. is entitled to the bad debt deduction of $424,692 it claimed if its advances to Fireless during 1971 and 1972 constituted "debt" which became worthless within the taxable year 1972.As stated in section 1.166-1(c), Income Tax Regs., only a bona fide debt qualifies for purposes of section 166. The regulation defines a bona fide debt as a debt which arises from a debtor-creditor relationship based upon a valid and enforceable obligation to pay a fixed or determinable sum of money. The regulations also point out that a gift or contribution to capital shall not be considered a debt for this purpose. Relying on this regulation, respondent determined no bad debt deduction was proper on the ground the advances were contributions to capital rather than bona fide debt. Despite consideration by the Secretary of the Treasury *29 since 1969 [8] and by the courts for decades, there are no uniform standards to resolve the debt-equity issue; each case depends upon its individual facts. John Kelley Co. v. Commissioner,326 U.S. 521 (1946). The Ninth Circuit, to which an appeal in this case would lie, see Golsen v. Commissioner,54 T.C. 742 (1970), affd. 445 F. 2d 985 (10th Cir. 1971), cert. denied 404 U.S. 940 (1971), has held that determination of the debt or equity issue is a question of fact, not law. A.R. Lantz Co. v. United States,424 F. 2d 1330 (9th Cir. 1970). However, the courts have not always been in agreement on the legal framework within which this factual issue is to be determined. Most have agreed that the bottom line is whether the parties in fact intended the advances to create debt rather than equity, in the case of a corporate recipient, or a gift in the case of an individual recipient. But in determining that intent some courts have relied heavily on the formal documentation, or *30 objective manifestation, of the intent of the parties, see Byerlite Corporation v. Williams,286 F. 2d 285 (6th Cir. 1960); while others have given greater weight to the subjective manifestations of intent to find what was really in the minds of the parties in light of the substantive economic realities of the transaction. See Matter of Uneco, Inc.,532 F. 2d 1204 (8th Cir. 1976). In J. S. Biritz Construction Co. v. Commissioner,387 F. 2d 451, 459 (8th Cir. 1967), the court looked for a "demonstrable business purpose" in making a loan and said: We feel the controlling principle should be that any transaction which is intrinsically clear upon its face should be accorded its legal due unless the transaction is a mere sham or subterfuge set up solely or principally for tax-avoidance purposes. Even a casual review of the cases involving the debt-equity issue reveals that a case can probably be found to support any reasonable approach to the problem. Hence, we cannot reconcile all the cases cited by the parties on brief and will make no attempt to do so in this opinion. In this case, under the rule of our Golsen case, supra, we will attempt to decide the issue within the legal framework *31 or approach delineated by the Ninth Circuit, since an appeal of this case would lie in that circuit. Accord, Litton Business Systems, Inc. v. Commissioner,61 T.C. 367 (1973). The Ninth Circuit said in A. R. Lantz Co. v. United States,supra at pp. 1333-34: Although the inquiry of a court in resolving the debt-equity issue is primarily directed at ascertaining the intent of the parties, [cits. omitted] a distinction must be made between objective and subjective expressions of intent. An objective expression of intent, as contained in the documentation of an advance of money, is generally not to be afforded special weight. It alone cannot be controlling of the debt-equity issue. However, analysis of the factors previously enumerated, including the objective expression of intent, leads to subjective resolution of the ultimate issue: Whether the parties in fact intended the advance to create debt rather than equity. * * * [In] resolving a debt-equity question we must deal "* * * with substance and reality and not mere form * * *. Pure gimmicks of form to shield the real essence of a transaction" cannot control. [Cits. omitted; printing error corrected.] In Litton Business Systems, Inc. v. Commissioner,supra at p. 377, *32 we distilled the above language to mean-- Was there a genuine intention to create a debt, with a reasonable expectation of repayment, and did that intention comport with the economic reality of creating a debtor-creditor relationship? The difficulty with the above statements of law are that they are generalities; so various factors have been developed by the courts to test the facts and circumstances of a particular case within the legal framework being used to determine the factual issue of whether the particular advance in question falls on the debt or equity side. These factors are numerous, some objective and some subjective, and have been recited in a number of opinions, see for example, Matter of Uneco, Inc.,supra at p. 1208, so we will not list them here, although we have given consideration to all of them. Also, rather than analyze in this opinion the facts here involved under the light of every factor on the debt-equity checklists, we confine our discussion to those points we find most pertinent to this case. We first point out several rather unusual circumstances in the facts of this case that must be given consideration in the overall picture. The agreement under which *33 Lumber Co. made advances to Fireless was part of a plan negotiated by Hubbard (for Fireless), Thompson Chemicals, Basic, and GZ to manufacture and market the roofing product. All of these parties were unrelated and had different interests, except to make a profit.Fireless was originally owned 50 percent by each of Hubbard and Johnson, but Basic acquired a 51-percent interest from them.Although Hubbard and Johnson owned equal interests in Fireless, they had unequal interests in Lumber Co., Hubbard owning about 70 percent and Johnson owning about 30 percent. Lumber Co. had no ownership interest in Fireless. We are convinced from the evidence that during the negotiations all of the parties were highly optimistic that the roofing product business would be successful and profitable. If so, Basic would realize a substantial profit on the sale of its magnesium oxide, a high-profit item. Lumber Co. would profit from its selling commissions. Thompson Chemicals would profit from its royalties, and GZ would profit by its manufacturing margins. All of these profits, except possibly GZ's, would have to be realized before Fireless would make a profit. But Basic believed that Fireless would *34 be profitable too, if properly managed, so it insisted on having a controlling stock interest in Fireless. In light of its past history, the business venture was undoubtedly recognized as speculative, despite the favorable cash flow projected by the parties. At the time the agreements were signed Fireless had no working capital and very few assets. Hubbard and Basic undoubtedly realized that Fireless would need working capital to carry its inventory needs and its receivables, but believed it would not need much more capital because its function would be more administrative than operational. To get underway, however, it would need plant machinery and equipment which it was obligated to provide to GZ, it would need raw materials which it was obligated to supply for GZ, and it would need some working capital to carry its receivables. GZ was obligated to provide the plant itself. It is not surprising that Hubbard and Basic decided upon a plan to furnish these needs in a manner they thought would best protect their interests in this speculative venture. Basic agreed to buy the machinery and equipment and then lease it to Fireless; it also agreed to furnish the raw materials and defer *35 payment therefor until Fireless could pay for it out of sales. On the other hand, Lumber Co. agreed to advance the necessary cash working capital from time to time as needed during the first 2 years. Hubbard and Basic wanted to be in a position to recover their advances before they were capitalized by Fireless, and the way to accomplish that was by lending Fireless money and credit rather than investing equity capital. The evidence is overwhelming that initially Basic and Lumber Co. actually intended their advances to be loans, and the documentation of the transactions on the books of Fireless and Lumber Co. support this conclusion. [9] *36 The advances were carried as accounts receivable on the books of Lumber Co. and were carried as accounts payable by Fireless. The auditors of Lumber Co.'s books approved carrying the item as a current asset because it was supposed to be repaid at an early date. The minutes of meetings of the directors of Fireless specifically recognized the obligation to repay these advances to Lumber Co. Lumber Co. wrote the entire amount of the advances off as a bad debt in 1972 with the apparent approval of its auditors. It is true that no note was received by Lumber Co. evidencing the indebtedness, no specific time was fixed for repayment, and no interest was charged. However, this is understandable if it is recognized that Lumber Co.'s advances were supposed to be made when and as needed and repaid as funds became available from sales. In other words, it would be a fluctuating account. The manner in which the working capital was to be provided would be in the sole discretion of Lumber Co. and might take such form as cash, lines of credit, inventory financing devices, or the like. The stated purpose of the advances was to permit Fireless to manufacture efficiently, and to supply promptly, Lumber Co.'s orders for products and to enable Fireless to comply with its obligations to GZ. In other words, the documentation supports petitioners' claim that this was a not unusual business arrangement in which a party expecting to profit from marketing a product advances funds to an unrelated manufacturer of the product to assist the manufacturer in supplying the product. Such arrangement could take *37 the form of contributions of capital or it could take the form of unsecured advances. The testimony of the witnesses supports the documentary evidence that the parties chose the latter form for the transaction. Furthermore, there was apparently no logical way acceptable to Basic for Lumber Co. to either acquire a stock interest in Fireless or even to enhance the relative interests of Hubbard and Johnson in Fireless by contributions of capital, because Basic insisted on a 51-percent interest and apparently was unwilling to put more equity capital into Fireless itself. We recognize, however, that because of the fact that Hubbard and Johnson owned all the stock of Lumber Co. and a 49-percent interest in Fireless, we should scrutinize the arrangement more carefully to determine whether the parties actually carried out their intentions as planned. Respondent's argument, as we understand it, is that because of the lack of normal formal characteristics of a loan, such as a note, interest, time for repayment, etc., and the thin capitalization of Fireless, the advances made by Lumber Co. to Fireless were contributions of capital to Fireless in behalf of Hubbard and Johnson and were therefore *38 constructive dividends to Hubbard and Johnson as stockholders of Lumber Co. Of course, the first hurdle this argument faces is that the alleged constructive dividends were disproportionate to the respective interests of Hubbard and Johnson in Lumber Co. This may not be fatal, see A. R. Lantz Co. v. United States,supra; Litton Business Systems, Inc. v. Commissioner,supra, but is entitled to consideration. Subjectively, we cannot imagine why Hubbard and Johnson, who together owned only 49 percent of the stock of Fireless, would be willing to invest, or have invested in their behalf by their company, over $400,000 as additional capital in Fireless without receiving a greater interest in Fireless. There is no evidence that there was any change in the ownership of the capital stock of Fireless as a result of these advances. Respondent argues that the advances were made to enable Fireless to meet its obligations to GZ under the agreement because Hubbard and Johnson had guaranteed those obligations. There is nothing in the record to indicate that Fireless was delinquent in any of its obligations to GZ; in fact, as we understand the evidence, one of the principal reasons the project *39 failed was because GZ could not meet its obligation under the agreement to manufacture a certain quality fireproof roofing shingle. Furthermore, if Hubbard and Johnson were meeting their obligations under the agreement by causing Lumber Co. to make these advances, it seems likely they would have done so in the form of loans to Fireless rather than investing additional capital. We agree with respondent that in all likelihood a disinterested lender would not have either loaned or extended credit to Fireless in the amounts advanced by Lumber Co. under the same terms and conditions. This factor alone will not necessarily preclude a finding of bona fide indebtedness. C.M. Gooch Lumber Sales Co. v. Commissioner,49 T.C. 649 (1968); Jack Daniel Distillery v. United States,379 F. 2d 569 (Ct. Cl. 1967). Furthermore, Lumber Co. was not a disinterested lender; it expected to receive about $250,000 annually on commissions from the sale of the product. We also believe it was at least understood between Lumber Co. and Basic that Lumber Co. would provide necessary working capital while Basic was providing the machinery and raw materials.We also agree that Hubbard individually was very enthusiastic *40 and optimistic about the project and may have let this cloud his judgment in letting Lumber Co. advance so large a sum of money. But this has little to do with deciding the debt-equity issue; the judgment would have been just as bad, possibly worse, to cause Lumber Co. to advance such a sum in the form of capital rather than debt. We recognize that these advances have some of the attributes more normally associated with equity capital than with debt. We have heretofore discussed the thin capitalization of Fireless, the fact that the advances were not evidenced by a note, that there was no security, that interest was not charged, that there was no fixed date for repayment, and that a disinterested third party would not have advanced this sum of money under the same circumstances. We have indicated that we do not believe those factors outweigh the evidence that at the outset the parties clearly intended the advances to be loans. It is also obvious that repayment of the advances was predicated on the success of the venture just as would have been the repayment of a note plus interest. The advances were at risk in the sense that they could be repaid only out of profits. On the other *41 hand it was intended that the advances be repaid in any event with priority over the capital stock if funds were available for the purpose. There was a definite obligation to repay; what was lacking was a definite source of funds to make the repayment. We have no evidence that the repayment of the advances was subordinated to the claims of other creditors of Fireless, if any. On the other hand, it is clear that the advances gave neither Lumber Co. nor Hubbard nor Johnson any greater equity interest in Fireless vis-a-vis Basic, nor any greater part in the management of that company, both of which are usually associated with capital contributions. There is no dispute in the evidence that representatives of Basic managed Fireless from November of 1970 until it ceased operations and that neither Hubbard, nor Johnson, nor any representative of Lumber Co. was involved in the day-to-day management of Fireless. Furthermore, the advances made by Lumber Co. were disproportionate to the equity interests evidenced by the capital stock of Fireless. Lumber Co. had no capital stock in Fireless, Basic, which owned 51 percent of the Fireless stock, had no interest in Lumber Co., and while Hubbard *42 and Johnson had equal albeit minority equity interests in Fireless, they did not have equal interests in Lumber Co. See Curry v. Commissioner,43 T.C. 667 (1965). And finally, the agreement provided for advances for working capital, not the acquisition of capital assets, and there is no indication that the advances were used to acquire capital assets for Fireless. On balance we are convinced that the parties in fact intended the advances to create debt rather than equity, that there was a reasonable expectation at the time the agreements were made that all such advances would be repaid, and that such expectation was not without economic reality. However, as time passed and GZ was not able to produce a quality product with sufficient consistency to be salable, we believe the reasonableness of that expectation faded and Lumber Co. must have realized that the venture could not succeed within the parameters originally anticipated. By the end of 1971 the working capital requirements of Fireless had more than doubled the amount originally deemed adequate, and Fireless was still operating at a loss.At some point in time the principals in this venture must have recognized that it was clearly *43 unrealistic for Lumber Co. to continue this credit arrangement with Fireless, and that the only hope for recovery of the amounts previously advanced was by an infusion of risk capital that might permit solving the production problems the project had encountered. After that time we find that the advances took on the nature of contributions to capital. It is difficult to pinpoint the exact time that the circumstances changed. Nevertheless, we feel we must do the best we can on the facts before us because we believe it would be erroneous and unwarranted to hold that all of the advances were debt or all of them were equity. C.M. Gooch Lumber Sales Co. v. Commissioner,supra.We believe the end of the year 1971 is a reasonable time to choose as the turning point. By that time it was apparent that the venture could not be successful as planned, Hubbard had brought to the attention of the Fireless directors that Lumber Co. had already advanced much more working capital than anticipated, and it would have been unreasonable for Lumber Co. or anyone else to loan Fireless additional funds without security of some sort. See Dodd v. Commissioner,298 F. 2d 570, 578 (4th Cir. 1962). We concluded *44 that the amounts advanced to Fireless by Lumber Co. prior to January 1, 1972, were loans and created bona fide debts and that all amounts advanced thereafter were contributions to capital. The second issue we must decide is whether the advances were constructive dividends to Hubbard and Johnson under sections 301 and 316. On brief respondent premises his constructive dividend argument on a conclusion that the advances were contributions to capital. Accordingly, the advances we conclude to be bona fide debt are not at issue. See Joseph Lupowitz Sons, Inc. v. Commissioner,497 F. 2d 862 (3d Cir. 1974), affg. on this issue a Memorandum Opinion of this Court, wherein it was held that advances from a brother corporation to a sister corporation were not constructive distributions to the shareholders who controlled both corporations because there was a valid obligation to repay at the corporate level and there was no direct benefit to the shareholders. The interest-free use of funds was not viewed as sufficient personal benefit to the shareholders. Funds transferred by a corporation for the benefit of a shareholder, including transfers to a related corporation, can be treated as constructive *45 dividends to the shareholder; and this is so even if the funds do not pass through the hands of the shareholder. But for such transfers to be treated as constructive dividends they must have been made primarily for the benefit of the shareholder and he must have actually benefitted directly therefrom. Indirect or incidental benefits from the transfers are not sufficient to give rise to constructive dividends. Rapid Electric Co. v. Commissioner,61 T.C. 232 (1973); Rushing v. Commissioner,52 T.C. 888 (1969), affd. on another issue 441 F. 2d 593 (5th Cir. 1971). The absence of a valid business purpose for the transfer will support a conclusion that there was a constructive dividend. Joseph Lupowitz Sons, Inc. v. Commissioner,supra.
Whether the transfers from Lumber Co. to Fireless which we have found to be contributions to capital were constructive dividends to Hubbard and Johnson under section 301(a) turns on whether they were made primarily for the benefit of Hubbard and Johnson. Respondent envisions Lumber Co. as a mere pawn of Hubbard and Johnson used to invest in the Fireless synthetic roofing project. In particular, respondent argues the advances were made to protect Hubbard *46 and Johnson from incurring liability under their guarantee of Fireless' obligations to GZ. Whether this be true or not, whatever benefit Hubbard and Johnson derived individually from these advances must be judged in relation to Lumber Co.'s self interest. Because of its distributorship agreement with Fireless (allowing it a 5-percent commission on sales), Lumber Co. had a substantial incentive to invest funds in Fireless for its own profit. The funds were advanced primarily to protect Lumber Co.'s interest and to enhance its chances of making a profit. Compare Rapid Electric Co. v. Commissioner,supra.Furthermore, we have no evidence that Hubbard and Johnson benefitted directly from the advances. The evidence suggests that GZ, rather than Fireless, was in default under its agreement with Fireless. Any benefit Hubbard and Johnson received was at most derivative. Rushing v. Commissioner,supra.We conclude that no part of the advances made by Lumber Co. to Fireless were constructive dividends to Hubbard and Johnson. In summary, under section 166(a), Lumber Co. is entitled to a bad debt deduction for all amounts advanced to Fireless prior to January 1, 1972, which is stipulated *47 to be $222,597; but it is not entitled to a bad debt deduction for advances made subsequent to that date. However, none of the advances were dividends to Hubbard and Johnson under sections 301 and 316 because they were not distributions with respect to their stock. Decisions will be entered for petitioners in docket Nos. 5904-75 and 5906-75. Decision will be entered under Rule 155 in docket No. 5905-75. Footnotes
1. Cases of the following petitioners are consolidated herewith: Hubbard & Johnson Lumber Co., docket No. 5905-75, and Wesley L. Hubbard and Beatrice Hubbard, docket No. 5906-75.↩
2. In docket No. 5905-75 respondent also disallowed $581 of investment credit with respect to a data recorder leased by petitioner because no evidence was submitted that the lessor had agreed to transfer the credit to petitioner as lessee. Petitioner raised the issue in its assignment of errors and attached a copy of an investment credit election statement. Respondent in his answer denied that he erred on this question. After these pleadings, the investment credit issue was not discussed by either party. Since petitioner has the burden of proving the election, see Rule 142(a), Tax Court Rules of Practice and Procedure, and no evidence of the election was presented at trial, we conclude respondent's disallowance of the credit is correct. Rule 149(b), Tax Court Rules of Practice and Procedure.↩
3. All section references are to the Internal Revenue Code of 1954, as amended and in effect in the years at issue, unless otherwise stated.↩
4. Fireless had a pilot plant in San Jose, Calif., but most of the manufacturing was to be done at the Sacramento plant.↩
5. S-T Development Corp. had granted a southern California franchise to this company for the manufacture of roofing products. Apparently, it was the counterpart of H & J Roofing Products Co., which had the northern California franchise.↩
*. At cost ** Includes $11,123.43 of machinery and raw materials contributed, at cost *** Does not include charges for salaries of some key personnel↩
6. The record is not clear about what eventually happened to Fireless and when it happened. The stockholders did put an additional $50,000 capital into it in the early part of 1973, apparently to assist in an effort to sell the company or its assets. Lumber Co. was sold to Evans Products Co. as of March 1, 1973, and Evans did not want to get into the roofing business.
7. Respondent did not specifically challenge the year of the loss, and no evidence was offered by either party to prove the year of worthlessness. Consequently, we accept the year 1972 as being the year of worthlessness.↩
8. Sec. 385, added by the Tax Reform Act of 1969, empowers the Secretary of the Treasury to promulgate regulatory guidelines on the debt-equity question. Not surprisingly, no guidelines have been developed to date.↩
9. We have no evidence on how the transactions were recorded on the books of Basic or its subsidiary to whom its interest in the project was transferred.